HERVE N. VEZINA, JR. *vs.* MAHONEY & WRIGHT INSURANCE
AGENCY, INC., & others.[1]

No. 94-P-1599.

Worcester. Suffolk. January 17, 1996. - March 26, 1996.

Present: BROWN, KAPLAN, & LAURENCE, JJ.

*Contract,* Performance and breach, Insurance agency, Construction of
contract, Employment. *Employment,* Termination. *Practice, Civil,* Judg-
ment notwithstanding verdict. *Words,* "Affiliate."

At the trial of a claim for breach of contract for the defendants' failure to
provide the plaintiff with a right of first refusal on the sale of an insur-
ance agency, the evidence was sufficient to warrant the jury's finding
that the person to whom the agency was sold was not an "affiliate" of
the seller so as to escape the right of first refusal provision. [222-224]
At the trial of a claim of breach of an employment contract, the evidence
was sufficient to support the jury's finding that the plaintiff's employ-
ment was to have been for a period of three years so that termination
could have been only for cause, which was not shown: the defendants'
motion for judgment notwithstanding the verdict was correctly denied.
[224-226]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment on January 24, 1991, and February 5, 1991, respectively.

The cases were consolidated for trial and were tried before
*Gordon L. Doerfer,* J., and various posttrial motions were
heard by him.

*Barbara A. H. Smith* for the defendants.
*Philip J. MacCarthy (William J. Ritter* with him) for the
plaintiff.

KAPLAN, J. The plaintiff (Vezina) sold his insurance agency
to the defendant Mahoney & Wright. He won verdicts for the
breach by Mahoney & Wright of promises incident to the sale
to employ him as manager of the sold agency and to provide

---

[1]Mahoney & Wright Corporation, Vezina Insurance Agency, Inc., Nor-
man R. Wright, and Mary Jane Wright.

him with a right of first refusal in case of a projected resale of the agency. The verdicts survive attack by Mahoney & Wright, and we affirm the judgment.

1. Vezina's father in 1928 founded the company later called the Vezina Insurance Agency, Inc. (hereafter sometimes called the Gardner Agency), a business with customers largely in the town of Gardner. Vezina worked there continuously after 1964, becoming its sole stockholder. By August, 1984, the Gardner Agency had incurred debts of perhaps $173,000. Vezina discussed the sale of the agency with a number of possible buyers, but the discussions made no headway because Vezina was interested in longtime employment by the agency after the sale, which these persons were loath to ensure. Finally Mahoney & Wright[2] came forward with an offer "to acquire the [Gardner Agency] and the services of its employee Herve Vezina, Jr." on terms outlined in a "letter of agreement" dated August 27, 1984, which was to be followed by more formal agreement.

2. Two contracts were entered into as of August 1, 1984.[3] By the first, a contract of sale between Mahoney & Wright, buyer, and the agency and Vezina, called seller, the buyer acquired all the shares of the agency for a consideration consisting of the assumption by the buyer of the listed debts of the agency not to exceed $200,000 in amount.[4] Vezina covenanted, provided there was no breach by the buyer of its payment obligations, (i) never to solicit insurance business from the accounts being transferred in connection with the sale, and to keep all information concerning these accounts confidential, and (ii) during the period the seller was receiving payments in the form of payment of debts and for three years thereafter, not to engage in the business of insurance agent or broker within Gardner or a fifteen-mile verge except in conjunction with the buyer. ·

The second contract, between Mahoney & Wright and Vezina, employed him as vice president and manager-

---

[2]For purposes of the present appeal we need not mark a distinction between Mahoney & Wright Insurance Agency, Inc., and Mahoney & Wright Corporation, and we speak simply of "Mahoney & Wright." Vezina sued Norman and Mary Jane Wright, personally, on a separate real property transaction which resulted in a judgment not appealed from.

[3]We describe the salient features of these and a later contract omitting other details.

[4]If the debts were liquidated for less than $200,000, Vezina would be owed the balance.

salesman of the sold agency at a salary amounting to $39,000 per annum plus certain "draws" against commissions or production. The agreement ran from September 1, 1984, to December 31, 1986. It contemplated that, if production goals were met, the agency was profitable, and the debts as listed were being retired as planned, a new employment contract would be negotiated, and, further, the plaintiff would be eligible to purchase twenty percent of the stock of the agency corporation.

3. Although the employment contract mentioned an end date of December 31, 1986, the parties evidently continued under that arrangement through 1989, with Vezina serving throughout as manager-salesman of the agency. Vezina had done well in the job, so a new contract was entered into (as promised) after negotiations between Vezina and Norman Wright, an important officer of Mahoney & Wright. (The negotiations centering in April, 1989, are mentioned at our point 6b below.)

The contract, executed on December 12, 1989, "modified" the terms of the 1984 employment contract. Vezina was to continue in his named capacities; his base salary was increased to $47,000 per year; and he was to participate in an incentive plan after a stated "base profit" was attained by the business. The incentive plan read thus:

> "6. a. Herve Vezina, Jr. shall participate in the following Incentive Plan with Mahoney & Wright Insurance Agencies after a base profit of 20% of gross income is attained.
>
> b. Herve Vezina shall receive 20% of the excess over the base profit due Mahoney & Wright Corporation referred to in Paragraph 6(a) above in the form of a bonus.
>
> c. 50% of the bonus referred to in Paragraph 6(b) for the previous year shall be considered a salary 'raise' and added to Herve Vezina's base salary for the following year. In the event that Herve Vezina, Jr. fails to generate the base profit referred to in Paragraph 6(a) for two years, Herve Vezina's salary shall be adjusted accordingly by rescinding the previous year's raise. In the event that Herve Vezina, Jr. fails to generate the base profit referred to in Paragraph 6(a) above for three years, Herve Vezina's salary shall be adjusted by rescinding the previous two years' raises."

The agreement touched on the terms of the 1984 sale contract. It noted that Mahoney & Wright owed Vezina a balance of about $16,000 after payments of corporate debts (see note 4, *supra*); after adjustment to cover amounts owed by Vezina to Mahoney & Wright, Vezina would be entitled to use the remainder to exercise an option to buy either stock or stock rights in Mahoney & Wright or to take cash.

Finally, the agreement set out a right of first refusal:

> "8. In the event that Vezina Insurance Agency, Inc. is offered for sale, Herve Vezina, Jr. shall have the right of first refusal to purchase following a refusal to purchase by Mahoney & Wright Insurance Agency, Inc. its affiliates and principals."

4. We outline the events leading to Vezina's being out of work and out of the agency by November, 1990, and his not being provided with first refusal when the agency was sold to another, one Robert Weiss, in spring 1992.

Weiss was a friend from college days of Norman Wright. Weiss had long been a football coach. After receiving a sum in settlement of a dispute (not described in our record) with his last employer, Weiss turned to Wright for assistance in gaining entree to the insurance field, in which he had no prior experience. Weiss in May, 1990, made an "assets only" purchase of the troubled David C. Wells Agency, Inc., in Fitchburg (hereafter the Fitchburg Agency). Around October, 1990, Weiss was introduced to Vezina as the prospective manager of the Gardner Agency. Vezina's reaction was that Weiss had insufficient experience and that he, Vezina, would not be able to serve under Weiss.[5] Nevertheless, on November 12, 1990, Weiss was installed by Norman Wright as manager of the agency.[6] There had been hostility between Vezina and Weiss, which intensified.[7] Vezina considered that he had been wrongly ousted from his agreed post. Norman Wright for Mahoney & Wright "terminated" the plaintiff by letter dated November 28, 1990. In fall 1990 it already appeared that

---

[5]Norman Wright testified that he had put Weiss through a cycle of training, but there could be no doubt that he did not match Vezina.

[6]Apparently he was paid no salary or a salary less than Vezina's. Charles Hennigar, financial officer of Mahoney & Wright, said no salary; Norman Wright put it otherwise.

[7]Vezina testified that Weiss assaulted him physically.

Weiss might buy the Gardner Agency. In spring 1992 Weiss did so, paying $60,000.[8]

After his severance from the Gardner Agency, Vezina engaged in activities in the insurance business that would violate the confidentiality and noncompetition covenants if those remained in force.[9]

5. The present action resulted from the consolidation of a Worcester Superior Court action by Vezina against Mahoney & Wright and a Suffolk action by Mahoney & Wright against Vezina. Avoiding procedural entanglements, we may say that the set-up of the consolidated action, tried to a jury in Suffolk Superior Court, was in outline as follows. Vezina sued Mahoney & Wright for breach of the first refusal and employment promises. Mahoney & Wright retorted with three claims, in effect for breach of the plaintiff's negative covenants — claims for unfair competition, interference with contractual relationships, and trade name violations. The jury brought in verdicts for Vezina for $60,000 for breach of the first refusal provision and $87,479 for breach of the employment undertaking. The jury found against Mahoney & Wright on its claims. These latter findings were responsive to the substance of the judge's instruction (not objected to) that if Mahoney & Wright had violated their obligations, notably the employment undertaking, then Vezina would be released from his negative covenants. (We note in the margin a difficulty with inconsistent verdicts that was properly overcome.[10])

6. It remains to consider the support in the evidence for the verdicts on the first refusal and employment matters.

a. First refusal. Comment is hardly necessary, for Mahoney

---

[8]This price contrasts with the figure of $78,207 as of January 1, 1989, for twenty percent of the shares of the Gardner Agency quoted by Norman Wright to Vezina in April, 1989. See our point 6b below.

[9]Mahoney & Wright criticizes some of Vezina's methods of attempting to secure business after his dismissal from the Gardner Agency, but such vicarious vindication of the proprieties is without bearing on this lawsuit.

[10]The jury first came in with verdicts for Vezina for breaches of the first refusal and employment agreements and verdicts for Mahoney & Wright on two of the covenants. The jury had overlooked the uncontested proposition that Mahoney & Wright could not recover on the covenants if it was in breach of the employment agreement. Without objection, the judge instructed again on the reciprocal relationships, and the jury returned their final verdicts.

& Wright's motions at the close of Vezina's case and at the close of all the evidence were addressed solely to the employment phase of the case, and its motion for judgment n.o.v. was accordingly also so limited. However, we add the following. The first refusal provision quoted above was understood by the parties to mean that the plaintiff could exercise this right if the agency was proposed to be sold to anyone other than Mahoney & Wright or any of its affiliates or principals. Was Weiss an "affiliate"? The word was not defined in the 1989 contract, and the judge properly treated it as ambiguous and subject to elucidation from the circumstances. This conformed to the statement in *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973): "When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." When the jury, in the course of their deliberations, appreciated the ambiguity, they inquired of the judge, "How is the word 'affiliate' legally defined and customarily used in contracts?" The judge answered (without objection), "In the context of this case there is no relevant legal definition of the term affiliate. And so, the question for you is: How was that term used, and what did the parties mean by it? . . . There is no binding legal definition relevant in the context of this case."[11] The jury could consider that Weiss was manager of the Fitchburg and Gardner Agencies just before the sale of Gardner to him — not a relationship of affiliate to Mahoney & Wright, or so a jury could well find. Further with respect to the Fitchburg Agency, it appears (although not with certainty[12]) that shares of the Fitchburg corporation were held by Richard Forrest, a Mahoney & Wright man. In May, 1990, Weiss purchased "assets only," of Fitchburg, not the shares, and indeed he contracted personally with the Fitchburg company (represented by Forrest) for so-called consult-

---

[11]At the same time, the jury also asked: "What are the Internal Revenue Code's requirements, if any, about reporting affiliates' income?" The judge answered (without objection), that there had been some testimony about consolidated balance sheets and so forth and they were to take that testimony in the context of all the other testimony and not to speculate about what the Code's requirements might be — it was irrelevant.

[12]Mahoney & Wright's financial officer could not produce a shareholders list.

ing services. The Fitchburg Agency did not appear in the consolidated balance sheet or consolidated tax returns of Mahoney & Wright but was treated separately (one reason assigned was that Mahoney & Wright did not want the consolidated picture to be contaminated by this losing agency). Without going further afield, we would hold (had the issue been properly preserved) that the jury did not depart from reason in finding that Weiss was not an "affiliate."

b. *Employment.* The agreement of December 12, 1989, on its face raised but left unsettled and unclear whether it promised Vezina employment merely at will, so that he could be dismissed at whim, or employment for a definable period, so that dismissal could be only for cause (which was not shown on this record). The parties acquiesced in the admission in evidence of circumstances that might help the jury resolve the ambiguity.The contract did not fix express beginning and end dates of employment as the 1984 contract had done. But there could be other signs or indicia suggestive of a promised period of employment. Vezina, we know, was interested in a long-term connection (presumably as manager) with his Gardner Agency now owned by Mahoney & Wright. A reading of the contract as being at will, subject to unilateral termination at any moment, would seem at odds with Vezina's desire for a steady job. So, too, it would seem inconsistent with the negative covenants Vezina had given: suppose a case where he was thrown out of work as manager within a short interval after December 12, 1989, and then had to face a prospect of compliance with his covenants which would in effect disable him to do independent insurance business.

The incentive plan quoted above according to its text was to run for three years. In the case of ordinary salesmen not otherwise assured work for a given period, the existence of a three-year bonus plan might not readily be construed as turning the relationship into firm employment for three years. But a different view could be taken with reason here, where an incentive plan had been tailored for a particular person who had served as manager of the business for five years and in fact had earlier been its owner.

Thus there was basis for a jury finding of promised employment for three years. There was also basis for a jury finding that Vezina was promised employment to age sixty-two (subject to conditions); and the judge charged, without objection, on both themes.

Vezina had a conversation with Norman Wright in late March or early April, 1989. He testified that Wright "said to me not to be concerned, that age 62, if I felt well, or longer, would be a proper age of employment for me . . . an age to consider working up 'til".[13] (Vezina was then forty-eight years old.) A letter from Wright to Vezina dated April 7, 1989, was intended to state the gist of the conversation. Wright wrote that he would be willing to come to an agreement to sell twenty percent of the Gardner Agency at January 1, 1989, value with payment in cash by July 1, 1989 (recall the provision in the 1984 employment contract about eligibility to purchase the twenty percent). He continued: "If the above offer is not acceptable [in fact there was no follow-up of this], I suggest we consider a package that includes first option for you to purchase the Gardner office and an incentive program that recognizes your efforts in the growth of the agency over the period of time the agency remains independent and your age 62." With perhaps some equivocation, Wright confirmed this picture in his testimony, adding there could be termination for cause.[14]

Contending under its motion for judgment n.o.v. that the verdict on employment was unsupported in the evidence, Mahoney & Wright confronts the proposition that the verdict stands if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff" who garnered the jury's verdict. *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). The judge correctly denied the motion. A comparable case is *Kravetz* v. *Merchants Distrib., Inc.*, 387 Mass. 457 (1982). Kravetz, having owned and operated his tire company in Peabody for twenty-six years, sold it to Merchants, which had a tire business in Boston and in branches in surrounding places. The contract of sale also provided for Kravetz's employment as manager of the Peabody unit at stated salaries for several successive periods with bonus features. Kravetz subscribed to a five-year

[13]Again Vezina testified: "I was concerned about a contract someone showed me that only went to age 55, and Mr. Wright said not to be concerned, that you should consider at least age 62, or even longer if you feel better . . . after age 62 if you still felt physically able."

[14]Richard Forrest, president of the Gardner Agency in 1989, describing the relationship between Vezina and Mahoney & Wright, said he could work "as long as he performed."

noncompetition clause. He served as manager for fourteen months when Merchants "redefined" his work to a position in the warehouse. Kravetz rejected the assignment as in effect an unjustified dismissal and sued for breach of contract. He won a jury verdict. Merchants contended that, as the contract had no fixed end date, it was as a matter of law a contract terminable at will, and the trial judge erred in denying a motion for judgment n.o.v. The court disagreed; it wrote, quoting from *Maynard* v. *Royal Worcester Corset Co.*, 200 Mass. 1, 4 (1908), "[w]hether there is a contract for services for a definite period of time . . . depends upon all the attendant conditions surrounding the agreement, as well as upon its terms, when the latter are not specific and clear," as was the case in the Kravetz contract. Thus it was proper for the jury to refer to "the nature of the employment, . . . the prior negotiation, [and] the situation of the parties," quoting from *Mahoney* v. *Hildreth & Rogers*, 332 Mass. 496, 498 (1955). "Reference in the [Kravetz] contract," the court said, "to salary payable at a yearly rate, with distinct provisions concerning salary, commissions, profit sharing and bonuses and a provision for noncompetition for five years, set in the context of the sale of a business that Kravetz had managed for twenty-six years, would support a jury finding that the contract provided for employment for a definite time." 387 Mass. at 460. The court also held that the jury could have found that the change of duties was a violation of the employment agreement even if there was no reduction in pay or benefits. *Id*. at 462.

*Judgment affirmed.*

*Order denying posttrial motions affirmed.*