Kobayashi v. Orion Ventures, Inc.

TAKAJI KOBAYASHI & others, trustees,[1] vs. ORION VENTURES,
INC. (and a companion case[2]).

No. 95-P-1912.

Suffolk. December 5, 1996. - April 18, 1997.

Present: PERRETTA, KASS, & JACOBS, JJ.

Landlord and Tenant, Lease as contract, Consumer protection. Contract,
Lease of real estate, Construction of contract, Damages. Evidence, Parol
evidence, Verbal completeness, Relevancy and materiality. Damages,
Breach of contract. Practice, Civil, Instructions to jury. Abuse of Process.
Summary Process. Consumer Protection Act, Landlord and tenant, Unfair
or deceptive act. Words, "Deli."

In an action on a lease, the judge properly admitted parol evidence for the
jury's consideration on the meaning of the ambiguous contract term
"deli" appearing in a noncompetition clause in the lease. [495-497]
At the trial of a civil action, the judge erred in sustaining an objection to a
witness's reading out loud parts of a document he had written, proffered
under the rule of verbal completeness, however the error was
inconsequential where the witness later testified directly on the subject
and where the whole document in question was admitted in evidence.
[497-498]
In an action on a lease, the judge acted within her discretion in declining
to allow submission to the jury of photocopies of several dictionary
definitions of the word "deli" and "delicatessen," where the dictionary
definitions were of marginal relevance to the issue of what the parties
had in mind in including the term "deli" in a noncompete clause in the
lease. [498]
In a civil action, the judge properly submitted to the jury the issue of dam-
ages calculated from the date of the breach of a lease agreement and
calculated on the basis of lost prospective profits upon the early termina-
tion of the lease. [499-501]
At the trial of a summary process action the judge correctly calculated the
amount of rent due the landlord before the termination of the lease and
correctly calculated the fair market rental value for the period after the
termination of the lease during which the tenant held over as a tenant at
sufferance. [501-503]

---

[1] Yoshio Yamashita and Takeshi Shiratori, all as trustees of Shuwa Trust
of Boston.

[2] Orion Ventures, Inc. vs. Takaji Kobayashi & others, trustees.

At the trial of a claim for abuse of process, the judge correctly instructed the jury on the elements to be proved. [503-504]

Where a summary process action was consolidated and tried with a related contract (lease) action between the parties, the plaintiff's notice of appeal, filed within the thirty days allowed under Mass. R.A.P. 4, was timely in the circumstances. [504-505]

The judge in a civil action properly concluded that a landlord's violation of a noncompetition agreement in a lease with its tenant was not an unfair or deceptive practice in violation of G. L. c. 93A, §§ 2 and 11. [505]

CIVIL ACTION commenced in the Superior Court Department on June 22, 1993.

SUMMARY PROCESS. Complaint filed in the Boston Municipal Court Department on September 19, 1994.

After consolidation for trial in the Superior Court, the cases were tried before *Margot Botsford,* J.

*Michael R. Coppock* (*David C. Fixler* with him) for Takaji Kobayashi & others.

*Damian R. LaPlaca* for Orion Ventures, Inc.

KASS, J. At the center of this case is the interpretation of a noncompetition clause in a lease: "Landlord will not permit the operation of any other delis in the Building during the term of this Lease." That pivotal phrase appeared in the last sentence of § 4 of a commercial lease between the trustees of Shuwa Trust, as landlord, to Orion Ventures, Inc., as tenant, for space to be used by tenant as a restaurant.

If, as counsel for the landlord suggested at oral argument, this case is about "what is a deli," a purist[3] would answer that a deli is a purveyor of central European delicacies such as corned beef, pastrami, brisket, chopped liver, lox, herring, whitefish, cream cheese, sour cream, sour pickles, pickled tongue, knockwurst, potato salad, cole slaw, and borscht.

---

[3]That purist, however, would be mistaken. According to Joan Nathan in Jewish Cooking in America 184-186 (1994), the first delicatessens in America "were primarily run by Germans and Alsatians." They served kuchen (cake), kraut (cabbage), fish, bread and wurst (sausage). "The word [delicatessen] itself derives from German and means delicacies, but is used not only to describe a shop but is also the word for the products sold in a shop. Eventually, Jews, too, went into the business," and the offerings began to take on the character described in the main text. According to Ms. Nathan and other authorities, a quintessential deli was the Carnegie in New York, whose proprietor said after a robbery, "Idiots! They took the money and left the pastrami."

Language, however, is a study in evolution, and the menu of the tenant, which initially did business as "O! Deli," offered considerably different attractions: butter croissant, tuna salad sandwiches, "Teriyaki Breast O! Chicken," yogurt, and — by way of saving grace — hot pastrami. The issue, as the O! Deli menu illuminates, is not what, as matter of law, constitutes a deli. Rather, the issue is: what did the parties mean by deli in their noncompetition clause?

A jury decided that the landlord violated the noncompetition clause and assessed damages. The Superior Court judge who presided over the trial ruled that the landlord's violation of the noncompetition clause did not constitute an unfair practice within the meaning of G. L. c. 93A. In a companion summary process case that had been consolidated for trial, the judge awarded judgment of possession to the landlord and assessed damages against the tenant. Both sides have appealed. We affirm the judgments.

These are the facts of the dispute, as the jury might have found them on the evidence most favorable to the plaintiff in each case. Following several months of negotiation, the landlord and tenant on October 28, 1987, executed a lease for 1,120 square feet on the ground floor of 265 Franklin Street in Boston. The tenant described to the landlord the sort of fast-food breakfast and lunch establishment that it proposed to operate, the importance of employees of office tenants in the same building as potential customers, and the need, therefore, for some protection from competitors dishing out similar food. That concern led to the "[no] other delis in the Building" clause.

The tenant opened for business (as O! Deli) in October, 1988. Its breakfast fare ("Morning Starters"), sold between 6 and 11 A.M., offered "Egg O! Muffin," assorted muffins, croissants, bagels, coffee, tea, and a variety of juices. Lunch business was heaviest in sandwiches and beverages. The tenant achieved a net profit of approximately $70,000 in 1989 and $65,000 in 1990. In 1991, a high vacancy rate at 265 Franklin Street and general economic decline combined to take net profits down to $10,000.

Throughout this period, Brandy Pete's, a more formal sit-down restaurant also operated off, and open to, the lobby of 265 Franklin Street. The tenant did not regard Brandy Pete's as competition because it catered to a "slow-food" patron. In

April, 1992, Brandy Pete's subleased a portion of its space to a cart that from 6 A.M. to 3 P.M. sold pastries, muffins, scones, bagels, as well as coffee, gourmet coffees (flavored), espresso, cappuccino, and cafe latte. By mid-1992, the tenant began to feel the effect of the cart's — which called itself Caffé Presto — morning competition.[4]

Starting in March, 1993, Jay White, the principal of the tenant, proposed a variety of rent reductions to compensate for the loss of business that White thought to be caused by the Caffé Presto cart. He also asked the landlord's consent to convert the tenant's operation to a Burger King. The landlord offered no succor; rather, it reminded the tenant on May, 1993, that under the lease the base rent was rising from $4,200 per month to $4,523 per month.

The tenant was first at the bar with a complaint asking for a declaratory judgment (that under the lease it was entitled to protection from the landlord against Caffé Presto); injunctive relief against Caffé Presto; damages for breach of contract (the noncompetition clause); and unfair or deceptive practices within the meaning of G. L. c. 93A, § 11. The landlord counterclaimed that the tenant's complaint was not only manifestly without foundation in law but was an abuse of process, the tenant's ulterior and sole motive for the action being to obtain a decrease in rent under its lease. Some six months after filing its complaint, the tenant stopped paying rent. The landlord responded with a summary process action in Boston Municipal Court. The two matters were consolidated for trial in Superior Court.[5]

1. *The meaning of the noncompetition clause.* The landlord's first point on appeal is that the parol evidence rule was a bar to considering testimony from White, who, it will be recalled, was the tenant's principal officer, and from the tenant's lawyer. Both were allowed to testify about what was said in negotiations about the noncompetition clause. According to the landlord, the trial judge erred in allowing the jury to

---

[4]In November of 1992, O! Deli changed its name to Ernie's Cafe. The gastronomic formula remained the same.

[5]By the time the case had come to trial, the tenant had abandoned the leased space. The declaratory judgment and injunctive relief counts in the tenant's complaint had become moot and, as such, were dismissed. The portion of the summary process case that was not mooted was the tenant's liability for rent.

consider that testimony. White was allowed to testify that he presented a copy of the O! Deli menu to Ed Daley, who was negotiating for the landlord, that he told Daley he did not want competition for that kind of restaurant business in the building, and that Daley had "understood the intent of what was wanted." The tenant's lawyer testified that Daley agreed to the "concept" of prohibiting any competitor from selling items in the building similar to those sold by the tenant. That testimony was not objected to but, because the parol evidence rule is one of substantive law, *Scirpo* v. *McMillan*, 355 Mass. 657, 661 (1969), the landlord is not barred from arguing that prior conversations should not have been considered to vary the terms of an unambiguous, integrated written instrument.

The judge correctly ruled that, notwithstanding an "integration clause" in the lease[6] declaring that no prior oral statements were to have any effect, the lease was profoundly ambiguous about the meaning of "[n]o other delis." To that degree the instrument was not fully integrated. Evidence was needed to shed light on what the parties had in mind when they used the term "deli." See *New England Fin. Resources, Inc.* v. *Coulouras*, 30 Mass. App. Ct. 140, 146-147 (1991). The parol evidence rule only bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing. *Gifford* v. *Gifford*, 354 Mass. 247, 249 (1968). *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360, 364-365 (1993). Restatement (Second) of Contracts § 215 (1981). It does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract term. *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973). *Vezina* v. *Mahoney & Wright Ins. Agency, Inc.*, 40 Mass. App. Ct. 218, 223 (1996). Restatement (Second) of Contracts § 214(c) comment b. See also *USM Corp.* v. *Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 116 (1989); *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 86 (1991).

"Deli" was not defined in the lease; nor was it self-defining. Compare *New England Fin. Resources, Inc.* v. *Coulouras*, 30 Mass. App. Ct. at 146-147, and *Vezina* v. *Mahoney & Wright*

---

[6]Section 33 of the lease provided as follows: "This Lease contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained or referred to in this instrument shall have any force or effect. This Lease shall not be modified in any way except by a writing subscribed by the parties hereto."

*Ins. Agency, Inc.*, 40 Mass. App. Ct. at 223, with *Ober* v. *National Cas. Co.*, 318 Mass. 27, 29-30 (1945), and *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 474-475 (1987). The tenant, whose lawyer concocted the "[n]o other delis" language, presumably had in mind an establishment that served up food of the sort on the tenant's O! Deli menu, a definition that another person, but not necessarily the landlord, might have thought a degradation of language.

The landlord complains that the evidence received on behalf of the tenant stripped the word "deli" of all meaning; it came to signify selling food in a manner, i.e., over the counter, similar to that purveyed by the tenant. Put another way, the sale of any line of food and drink that competed with the tenant's operation became a "deli." From the tenant's view that is precisely right. The answer to the landlord's protest is that, once parties use a word as chameleonic as "deli," the finder of fact — here the jury — may extract the intended meaning of "deli," for purposes of the document, from the circumstances that led to its use. The object of the inquiry was "to ascertain the meaning intended to be attached to the words by the parties who used them . . . ." *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 151-152 (1930). See *Hubert* v. *Melrose-Wakefield Hosp. Assn.*, 40 Mass. App. Ct. 172, 177 (1996).

2. *Evidentiary exclusions.* a. *Evidence under the doctrine of verbal completeness.* The tenant, without objection from the landlord, placed in evidence several of the landlord's internal memoranda. One was from Yoshio Yamashita, a trustee of the landlord, putting to Stephen Howard, the manager of the 265 Franklin Street building, some questions about the landlord's legal position in connection with the Caffé Presto operation; the other was Howard's two-page, typewritten response to those questions. From those documents the tenant's counsel read to the jury selectively, leaving the impression (taking a view of the evidence favorable to the plaintiff-tenant) that, contemporaneously with those memoranda, agents of the landlord were conscious of a violation of the noncompetition clause. On redirect examination, the landlord's counsel asked Howard to read other parts of his memo, notably:

> "The Caffé Presto operation I feel does not fit the description as a deli and I also feel that [tenant] is using this lease clause to negotiate a reduction in rent."

The trial judge sustained an objection.

Under the rule of verbal completeness, when a party places in evidence part of what was said or written at a particular time, the other party may add what has been omitted to give a full picture. *Commonwealth* v. *Watson*, 377 Mass. 814, 825-831 (1979). *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 741 (1991); Liacos, Massachusetts Evidence § 3.12 (6th ed. 1994). That principle does not open the gate for everything in a document or statement. There is always the test of relevance. *Ibid.* Here, the excluded material served to rebut an impression (of an admission of consciousness of violation of the noncompetition clause) that might have been formed by the jury from the parts of the Howard memorandum that had previously been read. Those of Howard's reflections that the tenant's counsel had elided should have been admitted under the rule of verbal completeness.

The error was inconsequential, however, because Howard was later allowed to testify directly that he thought Caffé Presto was not conducting a deli operation.[7] Moreover, the written memorandum itself was taken in evidence, and the jury, therefore, had the entire document to consider. The inability of the landlord's counsel to read aloud the lines in the indented paragraph above could not have made a material difference. See *DeJesus* v. *Yogel*, 404 Mass. 44, 48-49 (1989).

b. *Dictionary definitions.* Another category of exclusion that the landlord presses as erroneous was the trial judge's refusal to receive photocopies of definitions of "deli" and "delicatessen" from four authoritative English language dictionaries. Those definitions had something to say about the common understanding of the word "deli" and were probative, the landlord suggests, of what the parties intended. It would not have been error to receive the proffered photocopies, but, equally, the judge could be forgiven for thinking that dictionary definitions had only marginal relevance to what was in the minds of businessmen and lawyers pragmatically hammering out a lease. The exclusion of the photocopies was within the judge's discretion. As it turned out, the judge, in her instructions, read to the jury a dictionary definition of "deli" and allowed the jurors to consider it.

---

[7]Howard's testimony in this regard was received in connection with the tenant's c. 93A claim, but he spoke in the presence of the jury without limiting instruction.

3. *Measure of the tenant's damages.* After charging the jury generally about contract damages,[8] the judge broke the question into two parts. First, the jurors were to consider the damages the tenant had sustained from the date of the breach (a fact for the jury to find) to the termination of the lease on September 6, 1994 (a fact that the parties had stipulated). Second, the jurors were to assess damages that the tenant had sustained to the end of the ten-year term of the lease, i.e., through October 28, 1998. The jury found damages of $105,000 as to part one and $115,000 as to part two.

The landlord had requested the judge to instruct the jury that, as to part one, the calculation of damages should begin, not on the date when a breach of the noncompetition clause in the lease first occurred, but when the tenant first complained to the landlord that the Caffé Presto operation violated the "no other deli" provision. While a lease could provide that a landlord was not liable for damages until a breach had been called to its attention and it had an opportunity to cure it, the landlord has not staked its position on a lease clause but apparently on the not entirely irrational idea that the nature of the violation was such that a landlord would not be cognizant of it until complained of by a tenant. That proposition, however, is contrary to basic contract law, viz., that the measure of damages is the amount which places the injured party in as good a position as if the contract had been performed. *American Mechanical Corp.* v. *Union Mach. Co. of Lynn,* 21 Mass. App. Ct. 97, 101 (1985). Restatement (Second) of Contracts § 344, § 347 comment a (1981). 5 Corbin, Contracts § 992 (1964). Calculating damages as of the date of breach achieves that objective. Beginning to count damages for violation of a noncompetition clause only from the time of protest to the landlord would leave the tenant only partially compensated.

As to the second part of the damages question, the landlord

---

[8]The judge charged as follows: "[T]he injured party is entitled to be placed in the same position it would have been in if the contract had been performed . . . . In the context of a breach of a covenant or a provision of a lease, this principle of damages means that [tenant], as the party suffering the breach, if you find that, indeed, [tenant] did suffer a breach, is entitled to recover the difference between the value of the lease to [tenant] with the covenant against competition . . . and the value of the lease interest to [tenant] with the covenant having been broken by having another deli in the building.

asked the judge to instruct the jury that the tenant could not claim damages after the landlord had terminated the lease for nonpayment of rent. The landlord's theory was that the non-competition clause applied during the term of the lease and could not be violated once the lease had ended. That sounds logical, but the logic is Gilbertian.[9] Its flaw is that, on the theory of the tenant's case, what caused the termination in the first place was the competition from Caffé Presto that the landlord had permitted and which so bled the tenant that it could no longer pay the rent. Having, in that manner, brought about the termination, the landlord is responsible for the consequences. See Restatement (Second) of Contracts § 352 comment a.

Those consequences may include such prospective profits as are susceptible of proof with a reasonable degree of certainty, yet short of mathematical exactness. *Lowrie* v. *Castle*, 225 Mass. 37, 51-52 (1916). *Augat, Inc.* v. *Aegis, Inc.*, 417 Mass. 484, 488 n.4. (1994). *Frank D. Wayne Assocs., Inc.* v. *Lussier*, 16 Mass. App. Ct. 986, 988 (1983). The tenant presented evidence of its monthly sales and net profits before and after Caffé Presto began operations, as well as its profit margin on breakfast items. From that evidence the jury could calculate to a reasonable degree of certainty the profits the tenant would have expected to enjoy during the remaining years of its lease, had Caffé Presto not been operating. See

---

[9]The Gilbertian situation is an absurd state of affairs arrived at by logical argument. Darlington, The World of Gilbert and Sullivan 194 (1950). Consider, for example, the resolution in Gilbert and Sullivan's Ruddigore. The protagonist, Sir Ruthven Murgatroyd, under an ancient witch's curse that afflicts his line, must commit one crime each day or die. An honest man, he desires desperately to escape that burden. The following dialog occurs:

*Ruthven*: — "an idea has just occurred to me. A Baronet of Ruddigore can only die through refusing to commit his daily crime."

*Roderick* [an ancestor who is dead]: "No doubt."

*Ruthven*: "Therefore, to refuse to commit a daily crime is tantamount to suicide!"

*Roderick*: "It would seem so."

*Ruthven*: "But suicide is, itself, a crime — and so, by your own showing, you ought never to have died at all!"

*Roderick*: "I see — I understand! Then I'm practically alive!"

*Ruthven*: "Undoubtedly!"

*Parker* v. *Levin*, 285 Mass. 125, 128 (1934); *Kabatchnick* v. *Hanover-Elm Bldg. Corp.*, 331 Mass. 366, 372 (1954).

4. *Measure of the landlord's recovery of rent due.* a. *Before termination of the lease.* By the time the summary process component of this litigation came for trial, the tenant had vacated the premises, and the issue was the tenant's liability to the landlord for rent (see note 5, *supra*). The judge found rent due in the aggregate of $50,957.81. Under the lease, the tenant was also liable for legal fees and costs attendant on the rent collection action. Those fees and costs the judge found to be $3,678.75. Both sides have appealed from the summary process judgment.[10]

For its part, the tenant claims that, rather than assessing to the tenant — until the termination of the lease — the monthly rent established under the lease, the judge should have obliged the tenant to pay rent as diminished by the consequences of the landlord's failure to enforce the noncompetition clause. As we understand the tenant's position, the judge should have made a finding as to the fair market value per year of the noncompetition provision and should then have deducted that amount from the annual lease rent.

The judge was right not to do so for two reasons. First, the judge had already assessed damages against the landlord for breach of the noncompetition clause; to have set the consequences of the breach against the rent would have granted the tenant double recovery for the same wrong. Second, a provision in the lease, par. 7 of the rider, had provided that "Tenant shall not be entitled in any case to off-set against its liability for rent any sum owed to Tenant by Landlord." Although the traditional rule of independent covenants has been subject to question and some attrition, it still adheres when the parties to the governing lease have so stated. *Holmes Realty Trust* v. *Granite City Storage Co.*, 25 Mass. App. Ct. 272, 277-278 & n.2 (1988). See also Restatement (Second) of Property, Landlord & Tenant § 7.1 (1977); Bloom, Lease Drafting in Massachusetts §§ 6.84-6.87 (MCLE 1996). The lease in this case was the product of tough negotiation by experienced parties and their counsel. Particularly in such circumstances, courts should not "undertake to be wiser than the parties." *Guerin* v. *Stacy*, 175 Mass. 595, 597 (1900).

---

[10]We shall discuss later in this opinion why we think the tenant's notice of appeal from the summary judgment was timely filed, a point the landlord has put in question.

b. *After termination of the lease.* By written notice, the landlord terminated the lease, effective September 6, 1994, for nonpayment of rent. There is no dispute about the date or legal sufficiency of the notice. The tenant did not vacate the premises until some seven weeks later, on October 31, 1994. The judge reasoned that as the lease had been terminated, the tenant had become a tenant at sufferance during the holdover period and that the correct measure for a use and occupancy charge was the then current fair rental value of the premises. In the absence of a provision in the lease requiring lease payments beyond the lease term, that is the correct measure of damages. *Ghoti Estates, Inc.* v. *Freda's Capri Restaurant, Inc.,* 332 Mass. 17, 26-27 (1954). See *Swift* v. *Boyd,* 202 Mass. 26, 28 (1909); *Lowell Hous. Authy.* v. *Save-Mor Furniture Stores, Inc.,* 346 Mass. 426, 431 (1963); G. L. c. 186, § 3.

Since October 28, 1987, the date of the lease, the real estate market in Boston had suffered a severe sinking spell. By the time of the holdover period, the base lease rent was $4,523 per month. There was evidence to support the judge's finding that the fair market rent for the space had for the September to October, 1994, period slipped to $1,774 per month. Based on that figure, the judge assessed against the tenant a charge of $3,206.50 for the entire holdover period.

The landlord argues that there was a provision in the lease for the payment of rent beyond the lease term and that it was entitled to the lease rent for the period, which came to $11,375.10, an amount that was $8,168.60 greater than the judge had allowed for use and occupancy. Section 19.B of the lease, which deals with the subject of default by the tenant is, however, a study in opacity. In pertinent part it provides:

> "[I]f the Tenant shall fail to pay the base rent . . . at the option of the Landlord, the Tenant's right of possession shall thereupon cease and terminate and the Landlord shall be entitled to the possession of the Premises by process of law, any notice to quit, or of intention to re-enter the same being hereby expressly waived by Tenant. . . . In the event of such re-entry by process of law or otherwise the Tenant nevertheless agrees to remain liable for any and all damage, deficiency or loss of rent which the Landlord may sustain, whether or not the Landlord re-lets the Premises; and in

> the event of such re-entry Landlord may accelerate the rent for the balance of the term. . . ."

Looking at this language, the trial judge came to the conclusion, we think correctly, that it distinguished between a notice of termination and a notice of entry or an act of entry. Liability for rent, under the lease as written, accrued only if the landlord elected the entry option. Although a lessor may for a breach serve notice of entry and thereby work a termination of a lease, *Markey* v. *Smith*, 301 Mass. 64, 73-74 (1938), the reverse does not work. A statement by a lessor in a notice to the tenant that it had terminated the lease, with the demand that the tenant vacate and deliver up the premises does not have the effect of an entry for breach of covenant. *Haymarket Realty Co.* v. *Sullivan*, 249 Mass. 262, 265 (1924). Stavisky & Perkins, Landlord & Tenant Law § 812 (2d ed. 1993). As the lease text peculiarly limited the tenant's liability for lease rent to cases of entry, the judge properly fell back to the common law standard of a fair market use and occupancy charge for the tenancy at sufferance during the holdover period.[11]

5. *Abuse of process instruction*. The landlord filed a counterclaim to the tenant's complaint of abuse of process, alleging that the complaint of competition from Caffé Presto was a pretext, and that the tenant's ulterior purpose was to extort a reduction in rent. The jury found for the tenant. The landlord claims error in a refusal by the trial judge to give the following requested instruction: "[Landlord] need not win the action brought against it by [tenant] in order to recover for abuse of process." That is a correct statement of law. See *Kelley* v. *Stop & Shop Cos.*, 26 Mass. App. Ct. 557, 558 (1988); Restatement (Second) of Torts § 682 comment a (1977). Every possible correct statement of law need not, however, be included in jury instructions if the instructions as given are correct and touch on the fundamental elements of the claim.

---

[11]No great mystery attends the drafting of a provision that holds a defaulting and holdover tenant to the lease rent. For example: "In the event that this Lease is terminated as the result of an Event of Default by Tenant, Tenant covenants (a) to pay punctually to Landlord all the sums which Tenant covenants in this Lease to pay in the same manner and to the same extent and at the same time as if this Lease had not been terminated . . . ." Bloom, Lease Drafting in Massachusetts, Exh. 6F, at 6-121 (MCLE 1996).

*Corsetti* v. *Stone Co.*, 396 Mass. 1, 14-15 (1985). *General Dynamics Corp.* v. *Federal Pac. Elec. Co.*, 20 Mass. App. Ct. 677, 684 (1985). *Salamone* v. *Riczker*, 32 Mass. App. Ct. 429, 433 (1992). The judge had instructed as follows:

> "In order to prove its claim of an abuse of process, [landlord] must first prove that [tenant] used legal process; and second, that [tenant] did so knowingly and wrongfully to accomplish some ulterior purpose; that is, a purpose for which the process was not designed or intended or some illegitimate purpose, and then, of course, damages."

The judge then proceeded to explicate to the jury each of those elements. The instruction was correct based on the authority of cases such as *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 775-776 (1986), and *Kelley* v. *Stop & Shop Cos.*, 26 Mass. App. Ct. at 558.

6. *Timeliness of the summary process appeal.* When we previously considered summary process damages, we bypassed a procedural point, raised by the landlord, that the tenant's appeal was not timely and ought to have been dismissed. The landlord filed its summary process action under G. L. c. 239 in the Boston Municipal Court on September 19, 1994. The tenant moved to consolidate that eviction action with the contract action it had filed with Superior Court on June 22, 1993, and which was scheduled for trial on October 17, 1994. The trial judge in the Superior Court allowed the motion, reserving the summary process action for her decision after trial on the other issues. See G. L. c. 223, § 2B; *Nautican Realty Co.* v. *Nantucket Shipyard, Inc.*, 28 Mass. App. Ct. 902, 903 (1989). Each case retained its separate docket number. The parties stipulated that, in making her decision on the summary process questions, the judge could consider any evidence admitted in the contract action. Judgments in the consolidated cases were entered on May 11, 1995. The tenant filed its notice of appeal twenty-nine days later on June 9, 1995, within the thirty-day period allowed by Mass. R.A.P. 4, as amended, 395 Mass. 1110 (1985). The rub is that the appeal period from a summary process judgment is ten days. G. L. c. 239, § 5.

We have required strict adherence to the short period for

claiming an appeal prescribed by G. L. c. 239, § 5. *Liberty Mobilehome Sales, Inc.* v. *Bernard*, 6 Mass. App. Ct. 914 (1978). *Jones* v. *Manns*, 33 Mass. App. Ct. 485, 488-489 (1992). The process provided for in c. 239 is designed, after all, to be *summary*. See *Hodge* v. *Klug*, 33 Mass. App. Ct. 746, 757 (1992). Once the summary process case was consolidated with the contract case, however, it lost its fast track identity and underwent a metamorphosis into a standard civil action. The facts bearing on the summary process action were developed in the course of the jury trial of the contract claim. The cases had become integrated, and we think it appropriate, in those circumstances, to apply to the various aspects of those cases the same period for filing a notice of appeal — the thirty-day one established by Mass. R.A.P. 4. The tenants' notice of appeal was, therefore, timely.

7. *The c. 93A claim*. The trial judge concluded that, although the landlord had committed a breach of the noncompetition provision, it had not acted unfairly or deceptively, and it had not violated G. L. c 93A, §§ 2 and 11. The landlord did not violate a provision of the lease to gain an economic advantage or to extort a concession. Compare *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474, 476 (1991), with *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992). There was no evidence that the landlord obtained any specific economic advantage from the Caffé Presto cart which, it will be remembered, operated under a sublease from Brandy Pete's. The landlord and tenant had a genuine difference of opinion about the meaning of the "no other deli" clause. That was not remarkable if one bears in mind that the tenant, in order to make its case, was bound to concede that the noncompetition clause, proposed by its own counsel, was not self-defining. This was an ordinary contract dispute without conduct that was unethical, immoral, oppressive, or unscrupulous. *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). Not every unlawful act is automatically an unfair or deceptive one. *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 109 (1979).

*Judgments affirmed.*