Kaplan, Mitchell H., J.
Introduction
This case came before the court for a juiy-waived trial on October 9 and 10, 2012. Five witnesses testified and twenty-seven exhibits were entered in evidence. The parties requested and were given leave to file post-trial pleadings. In consideration of the testimony, exhibits and post-trial memoranda, the court makes the following findings of fact and conclusions of law.
FACTS
The plaintiffs, Daniel and Tracy Foley, purchased 33 Bearse’s By-Way in Chatham (the Property) as a vacation home on October 8, 1999 from Marlin Development, LLC (Marlin). The purchase price was $225,000. The purchase was financed in part with a loan from First Service Home Mortgage, Inc. (First Service) in the amount of $ 178,000, secured by a first mortgage on the Property. The Foleys had their own attorney represent them in the negotiation of the purchase and sale agreement with Marlin. First Service retained the defendant law firm, Monteforte & McGrail (the law firm and the individual defendants will be referred to generally as the defendants unless it is necessary to distinguish between them) to represent its interests in connection with the loan and mortgage and to conduct the closing. As part of that engagement, a title abstract was obtained for the Property. At the closing, a Certification of Title was rendered to both the Foleys, as mortgagors, and First Service, as mortgagee, as required by G.L.c. 93, §70. The Certification was signed by John McGrail on behalf of the law firm. It certified that the mortgagor, that is the Foleys, “held a good and sufficient record title to the . . . Property, free from all encumbrances, excepting only matters which are expressly enumerated therein and in the Schedule attached hereto [not relevant to this action]” at the time the mortgage was recorded. The Foleys elected to purchase title insurance for the Property, and Monteforte acted as agent for Old Republic National Title Insurance Company (Old Republic), which issued the policy. A quitclaim deed from Marlin to the Foleys and the First Service mortgage were timely recorded in the Barnstable Registry of Deeds.
Over the next few years, the Foleys twice refinanced the Property; the lender was Citizens Bank. No issues concerning title to the Property arose in the course of those refinancings. In August 2004, the Foleys purchased another vacation home in Chatham, and the Property was placed on the market.
At some time in 2005, William McDonald agreed to buy the Property; the closing was scheduled for September 9, 2005. McDonald sought mortgage financing for the purchase from Lightspeed Mortgage, which retained attorney Maiy Beth Cuddy to represent it. Cuddy obtained a title examiner’s abstract for the Property. On August 16, 2005, after reviewing the abstract, she wrote to counsel at Stewart Title Guaranty Company (StewartTitle), the title insurance company selected by Lightspeed for its anticipated mortgage, expressing a concern regarding record title to the Property, in particular the sale to Marlin in 1998:
Maiy deBurgh Daly died owning [the Properly]. Her will was allowed in Florida and was filed with Barnstable Probate Court. Charles U. Daly is Executor and Richard K. Donahue is named as Trustee of the trusts established under the will. . .
Charles U. Daly, Executor . . . transfers locus to Richard K. Donahue, trustee of the testamentary trust set forth in the Will of Maiy D. Daly for Nominal consideration . . .
Richard K. Donahue, Trustee of the testamentary trust set forth in the Will of Maiy D. Daly sells locus.
My questions are as follows:
Does the Richard K. Donahue, Trustee need to be appointed by the Barnstable Probate Court or is it sufficient that he is named Trustee in the Will and the Will is filed with the Barnstable Probate Court? I believe that the filing of the Will and approval by the Court authorizes him without any other action, however I want to be certain.
I do not have any issue with the Deed form the Executor to the Trustee; [sic]
Does Richard K. Donahue, Trustee, have the power to sell locus from the Trust? I am not finding any specific language in the will providing him with the authority to sell.
Stewart Title agreed with Cuddy that “the language establishing the trust under the will does not provide the Trustee with the power to sell.” Stewart Title declined to issue a title insurance policy for that reason, and McDonald informed the Foleys that he would not purchase the Property because of the issue raised by Cuddy and Stewart Title. The closing on the McDonald transaction was put off. The Foleys made a claim on Old Republic under their title insurance policy. On September 8, 2005, Monteforte, who had been informed of this title issue, wrote to Cuddy and *511 Old Republic explaining his position that the Will provided the Trustee the implied authority to sell the Property and there was no defect in the title. In a letter dated September 19, 2005, Old Republic sided with Cuddy and Stewart Title and agreed “that it will undertake to correct said defects [the purported lack of authority of Donahue Trustee to sell the Property to Marlin] in a timely manner.” Old Republic retained attorney William Heney to address this issue. Three months later, on December 7, 2005, Heney filed a four-page complaint in the Barnstable Probate Court seeking “ratification of a doubtful act” of the Trustee. On May 31, 2006, a Motion for Default Under Rule 55(A) dated February 17, 2006 was allowed by the Probate Court and a final judgment ratifying the deed to Marlin entered. The final judgment was recorded in the registry of deeds on June 9, 2006.
On June 21, 2006, McDonald purchased the Property for the same price that he offered to pay the previous September: $769,000.
The closing on the sale of the Property to McDonald took place 285 days from the date that the original closing was scheduled to occur. At the original closing date and the actual date of sale, the Foleys had two loans from Citizens Bank secured by mortgages on the Property. On June 7 and 8, 2006, respectively, ahead of the anticipated sale to McDonald, Citizens Bank reported that the pay-off on one loan was $185,959, with per diem interest accruing at $30.19, and pay-off on the other was $198,899, with per diem interest accruing at $37.85. The precise daily interest paid by the Foleys during the 285-day period is unknown, as the principal balance on these loans on each day is unknown. The Foleys also had outstanding during this period a loan from Sovereign Bank on their other vacation home in Chatham on which they were paying 4.99% interest. Mr. Foley testified that he would have reduced the principal outstanding on this loan by the amount that he would have received upon the sale of the Property in September 2005, which he estimated at $334,000. Real estate taxes on the Property during the period September 2005 to June 2006 were $5.75 a day. There was no evidence presented as to what use, if any, the property was put while the title issue was being resolved.
Each party offered the testimony of an expert witness with substantial experience in real estate law and conveyancing. The plaintiffs’ expert opined that good and sufficient record title did not exist when the Foleys purchased the property from Marlin because the Daly will (hereafter, the Will) did not expressly state that the Trustee had the authority to sell the Properly and sell it without obtaining an order from the Probate Court permitting him to do so, and, therefore, absent a court order recorded in the registry authorizing the sale there was a defect in the title. According to plaintiffs’ expert, good and sufficient record title means title that is “unassailable,” and because of this defect that standard was not met.[1] The defendants’ expert opined that the Trustee’s authority to sell the Property was implied, as a matter of law, from the express language in the Will and, therefore, good and sufficient record title existed when the Foleys purchased the Property from Marlin and the First Service mortgage was recorded.
DISCUSSION
The Nature of the Claim
At the time of trial, the plaintiffs’ amended complaint asserted three counts against the defendants: negligence, negligent misrepresentation, and violation of G.L.c. 93, §70. The case law is less than clear as to exactly how to define the nature of the claim that purchasers/mortgagors of a properly have against attorneys for a mortgagee who “render” a certification of title to them, in the manner required by G.L.c. 93, §70, and who then allegedly suffer loss when it later appears that the purchasers/mortgagors did not have “good and sufficient record title to the mortgaged premises,” at the time of the recording of the mortgage. The mortgagee’s attorneys will not generally have an attorney/client relationship with the mortgagors, so no duty to the mortgagors arises out of that relationship.[2] See Page v. Frazier, 388 Mass. 355, 360-61 (1983). Moreover, there is no reason to believe that the mortgagee’s attorneys are making statements to the mortgagors with the intent that they be relied upon when they render a certification, rather they are only doing that which the statute requires of them. In addressing claims by mortgagors arising under certifications, some courts have considered whether the mortgagee’s attorney was negligent in certifying the title. See, e.g., Fall River Savings Bank v. Callahan, 18 Mass.App.Ct. 555, 558 (1984) (the trial judge found the defendant negligent in failing to report possible tax liens). Section 70, however, does not state that the mortgagee’s attorney will be liable to either the mortgagor or the mortgagee only if he/she was negligent in certifying title. While it may be that, generally, an attorney who certifies a title with a defect or fails to identify an encumbrance will have performed his/her engagement negligently, perhaps a defect could exist that an attorney of average training and experience would not have seen when examining a title abstract. Would that attorney still be liable if the defect caused the mortgagor loss? At least, for the purposes of this case, the court finds that G.L.c. 93, §70 creates a statutoiy cause of action against the attorney who renders a certification that the mortgagor had good and sufficient record title to the property (except for enumerated encumbrances) at the time the mortgage was recorded, when the certification is in error and the error causes damage to the mortgagor. The court will therefore dismiss Counts I and II, and, under Count III, decide whether the certification was in error and, if so, whether that error caused the Foleys damage.[3]
*512 The Timeliness of the Claim
Before addressing the title issue, the court considers the defendants’ argument that the Foleys’ claim is barred because the Property was sold before this suit was filed. The defendants direct the court to the following provision of §70: “Said certification shall be effective for the benefit of the mortgagor so long as said mortgagor has title to the mortgaged premises, and shall be effective for the benefit of the mortgagee so long as the original debt secured by the mortgage remains unpaid.” The defendants argue that this sentence creates something like a statute of limitations that expires when title to the mortgaged properly passes to another owner and, therefore, the period of limitations in which the Foleys could file suit against them expired when they sold the Property to McDonald in June 2006. The court finds this interpretation of this sentence in §70 strained. The sentence says nothing whatever about when a law suit must be filed, but rather places a limit on the period in which a mortgagor or mortgagee will have the benefit of the certification. In this case, the purported title defect allegedly caused injury when McDonald refused to purchase the property from the Foleys. At that time, the Foleys still had title to the property and enjoyed the benefit of the certification. To say that the statute precludes the Foleys from selling the property, if they wish to recover based on an error in the certification, and, thereby, mitigating the defendants’ potential damage makes no sense and furthers no apparent purpose.
The Trustee’s Authority to Sell the Property
Turning to the title issue, case law defines “good and clear record title” as follows:
Good and clear record title “rests on the record alone, which must show an indefeasible unencumbered estate.” O’Meara v. Gleason, 246 Mass. 136, 138 (1923). If extrinsic evidence, i.e., beyond the record, is required to support the title, it may be marketable, but it is not good and clear record title. See also Tramontazzi v. D’Amicis, 344 Mass. 514, 516-17 (1962); King v. Stephens, 9 Mass.App.Ct. 919, 920 (1980); Park, Real Estate Law Sections 951 & 953 (2d ed. 1981). It is the word “record” which gives the phrase “good and clear record title” distinct meaning in conveyancing. A “clear title,” unmodified by the word “record,” has the same connotation as “marketable title,” i.e., it “may be shown by oral or other evidence outside the record to be marketable beyond any reasonable doubt.” Cleval v. Sullivan, 258 Mass. 348, 351 (1927), quoting Morse v. Stober, 233 Mass. 223, 226 (1919).
Coons v. Cartensen, 15 Mass.App.Ct. 431, 433 (1983). Section 70 requires that the certification use the words “good and sufficient record title.” The parties have not directed the court to any authority that draws a distinction between “sufficient” and “clear” in this context. While one might argue that “clear” implies a higher standard than “sufficient,” the Coons case suggests that the key word in interpreting the meaning of these phrases is “record.” A review of the recorded instruments at the registry must demonstrate “an indefeasible and unencumbered estate.” In this case, the Will is a part of the record of the title to the property and both parties agree that outcome of this case turns on the language of the Will. The court will use the definition set out in Coons.
The Will provided for the establishment of two trusts: The Family Trust and the Marital Income Trust.[4] The Trustee of the Family Trust was directed to “hold and dispose of [the Trust property]” as follows:
The Family Trust. The Trustees shall pay to, or apply for the benefit of, any one or more of my spouse and my issue all or so much of the net income and the principal of The Family Trust as the Disinterested Trustee, in such trustee’s sole discretion as he may deem to be desirable. As a guideline only to the Disinterested Trustee, it is my wish that such trustee look first to the needs, welfare, and best interests of my spouse before considering those of the other beneficiaries. Any beneficiary (including my spouse) maybe excluded from any or all of such payments and applications.
The Foleys’ expert testified that whenever the seller of a property is not the individual who owned it, a title examiner must look for the source of the seller’s authority. According to the Foleys’ expert, since the quoted provision of the Will does not expressly state that Trustee of the Family Trust has the authority to sell the property, let alone sell it without receiving an order from the Probate Court, and no court order authorizing the sale is in the record, a title defect existed. The Foleys cite no case law, statute, or horn book authority for this proposition.
The defendants do not contest the proposition that the record of the title must contain authority for the sale by the Trustee of the Family Trust to Marlin. Rather, they argue that the Will provides the requisite authority. They cite Smith v. Haynes, 202 Mass. 531 (1909), in support of their position. This case involved a petition by executors and trustees for instructions as to their duties under a will. As in the case before this court, the will appointed trustees. The will directed the trustees to provide for the advancement of the interests of the trust’s beneficiaries until they all reached the age of majority. While the main purpose of the will was “to preserve the legacies until the beneficiaries severally attain majority,” the trustees were given the discretion to spend the trust’s funds to further the interests of the beneficiaries. The Supreme Judicial Court concluded that under these circumstances: “It follows that the trustees are to determine what are the needs of the several minors for advancements,” and therefore authorized to sell trust assets in furtherance of the needs of the beneficiaries. Id. at 535. The Court then continued:
*513 The final request for instruction is whether the trustees have power to sell real estate. The residuum of the estate consists of both real and personal estate. The will gives no express power to sell the real estate. But it confers upon the trustees an active duiy to provide for the needs of certain beneficiaries. It is conceivable that sickness or distress might require the entire share of some of the minors to relieve their needs before the time for final payment arrives. If follows that by implication without express statement there is conferred upon the trustees a power of sale of the real estate.

Id.

This court concludes that the Supreme Judicial Court’s holding in Smith v. Haynes applies to the language of the Will at issue in this case. The Trustee is expressly given the discretion to use income and principal for the welfare and benefit of the beneficiaries, in particular the spouse. Indeed, the Will goes further than the will at issue in Smith, as it directs the Trustee to dispose of the testator’s property and to make payments to the beneficiaries from principal “as he may deem desirable.” Smith informs the Trustee that the fact that the Will does not expressly empower him to sell real estate as well as personal property is of no moment as, by implication, the power to sell the real estate is conferred upon him by the language in the Will establishing the Trusts and directing the Trustee to support his beneficiaries by disposing of Trust assets if he chooses to do so.
The question then is: Where the language of the Will, by law, includes the power to sell the real estate, must the Trustee nonetheless obtain a court order authorizing the sale, and record that order, before the transaction can be accomplished without jeopardizing title to the property? The plaintiffs have cited no authority for such proposition, and the court has not found any.[5] While an attorney reviewing a title abstract might prefer that such an order be recorded so that the attorney need not research the issue, clear or sufficient record title requires that the determination that the Trustee had the authority to sell the real estate be evidenced in the recorded documents. See Coons, supra. In this case, the Will is such a document, and an analysis of the Trustee’s authority to dispose of property, real and personal, as set out in the Will and informed by the Supreme Judicial Court’s decision in Smith v. Haynes, would enable an attorney examining the record to conclude that good and sufficient record title passed from the Trustee to Marlin. The fact that Lightspeed’s and Stewart Title’s attorneys were concerned about the absence of language in the Will expressly granting this authority to the Trustee is no more proof that a court order was required to avoid a defect in title than is the fact that the attorneys for the Foleys or their mortgagees were apparently not concerned about its absence when the Foleys purchased the Property from Marlin and refinanced it.
The court therefore concludes that the Foleys held “good and sufficient record title” to the Property when their mortgage to First Service was recorded.
Damages
Having found that the defendants are not liable to the Foleys under §70, it is not necessary that the court address damages. However, to avoid a retrial in the event that the Foleys successfully appeal from this decision, the court will determine the damages that it would have awarded, if liability had been proven.
The defendants argue that the amount of damages due the Foleys as a result of the delayed closing cannot be determined with mathematical accuracy because the exact amount of interest that the Foleys paid on the loans secured by the Property is unknown as the exact principal amount of the loans outstanding on each day of the delay period is also unknown. However, damages need only be proven “with a reasonable degree of certainty, yet short of mathematical exactness.” See Kobayashi v. Orion Ventures, Inc, 42 Mass.App.Ct. 492, 500 (1997). The Foleys had approximately $385,000 in loans secured by the Properly outstanding in September 2005. The court finds that the weighted average interest the Foleys were paying on those loans was approximately 6%. The Foleys also had borrowed well in excess of $334,000 to buy their other Chatham property and were paying 4.99% interest on that loan. The court credits Mr. Foley’s testimony that he would have received approximately $334,000 on the closing date had he sold the Properly to McDonald as anticipated and used that cash to reduce his loan on the other Chatham properly. Accordingly, had the sale of the Property to McDonald closed on September 5, 2012, within a few days, the Foleys would have been relieved of the obligation to pay interest at an annual rate of 6% on $385,000 of debt and 4.99% on $334,000 of debt. The Foleys also would not have had to pay property taxes on the Property from the originally anticipated date of sale.
The court, however, also finds that the Foleys did not act reasonably promptly to mitigate damages. It took three months to file the four-page complaint to correct the alleged title defect and then three months to have the motion for entry of the default judgment allowed. The Foleys offered no evidence concerning these lengthy periods of delay. The court finds that the title defect should have been corrected within six months and that the sale to McDonald would then have occurred on or about that time.
Therefore, the court finds that if the defendants were liable to the Foleys under §70 for rendering an erroneous certification of title, it would have awarded damages to them in the amount of $21,000.
*514 ORDER
For the foregoing reasons, final judgment shall enter for the defendant dismissing all counts of the complaint with prejudice.

 Plaintiffs’ expert also opined that the description of the Property in the deed to the Foleys was deficient. The defendants’ expert disagreed. Since the purported description error played no role in Stewart Title’s decision not to issue a title insurance policy or McDonald’s decision to delay the closing, and it was never corrected, if in fact correction was required, that opinion is not relevant to any issue raised by this action.

 There is no evidence that defendants had an attorney/client relationship with the Foleys in this case.

 In this case, this is a distinction without a difference as the issue is whether the language of the Will was insufficient to authorize the sale without court order. Plaintiffs claim that it was negligent to certify title based on the language of the Will without a recorded court order. Defendants state that no court order was required and there was no defect in the record title. Neither party contends that the defect was so arcane that a non-negligent attorney might miss it.

 Which property went to which trust was estate tax driven, described elsewhere in the Will, and not relevant to any issues raised by this case. The Property passed to the Family Trust when the Will was allowed. Both parties’ experts testified that the deed from the Executor of the Daly Estate to the Trustee of the Family Trust for nominal consideration was unnecessary and did not have any effect on title to the Property.

 G.L.c. 203, §16 permits a trustee to petition a court for an order that property may be sold. However, that statute also makes clear that while a trustee can apply for an order of sale, even if the trust instrument authorizes the trustee to convey the property, “nothing herein shall be deemed to require a license where such authority exists.”