XlFARAS, J.
BACKGROUND
The plaintiff, Lars Boman (“Boman”), a surgeon practicing in Fall River, brought suit against Southeast Medical Services Group (“SMSG”), a multi-specialty medical group practice and eleven member physicians, Drs. Rajaratnam T. Abraham, Americo Almeida, Robert Courey, Christopher Lebo, Majed Mouded, Richard Perkins, Frederick Schnure, Jesus Sosa, James Stubbert, Elie Tawa, Henry Vicini; Gregory Squillante (“Squillante”), the group’s administrator and several related entities, Somerset Medical Associates, Inc. (“SMA”) and Truesdale Hanover RI Associates (“THRI”). The gravamen of the plaintiffs claim is that the defendants reduced the number of referrals to him because he declined to join the SMSG medical group because he refused to pay ten percent of his income to SMSG to continue receiving referrals from SMSG referring physicians. The plaintiff further alleges that said ten percent payment was an unethical and illegal kick-back for continued referrals. Boman further alleges that, after refusing to join SMSG and pay the ten percent, the defendants stopped referring patients or reduced the volume of the patient referrals and this decline in referrals injured Boman’s surgical practice. Boman’s claim is that the conduct of the defendants constitutes unfair trade practices under G.L.c. 93A, §11. The court bifurcated this matter and this trial addressed liability only.
FINDINGS OF FACT
In 1988, Boman completed his general surgical residency in Buffalo, New York, and moved to Fall River, Massachusetts, having been recruited by Hanover Medical Associates (a group of physicians — a realty organization, not a group practice — having offices in one of the two Hanover Borden Buildings physically attached to Charlton Hospital). At the time of Boman’s recruitment, several general surgeons had recently retired from practice in the area. Thereafter, Boman rented office space at 300 Hanover Street, Fall River, Massachusetts, which is one of the two Hanover Borden Buildings that is physically attached to Charlton Hospital. Since moving to Fall River, Boman has continuously worked as a general surgeon and as a solo practitioner. As a specialist (surgeon), a substantial portion of Boman’s business comes from referrals from other physicians, especially primary care physicians. SMSG is a general partnership that was formed in July 1992 as evidenced by the General Partnership Agreement, Exhibit 6. The SMSG Partnership Agreement was duly executed by all its partners. The express purpose of SMSG was “to engage in and conduct a group practice of medicine and to engage in such other activities related thereto ...” SMSG was a multi-specialty physician group. The SMSG partnership was composed of primary care and specialist physicians, such as surgeons, radiologists, gastroenterologists and cardiologists. Primary care is the general medical care provided to a patient by a physician. Primary care most typically involves family medicine, internal medicine, pediatrics, obstetrics and gynecology and general medicine, as well as preventive health services.
In 1992, many physicians in the Fall River medical community were uncertain as to the manner in which health care would be administered in the coming managed care environment. Managed care is the process by which a health care insurer or other payor becomes involved in the delivery of health services with the goal of controlling the cost and/or quality of such services. As the payment structure in the health care industry changed and evolved, physicians practicing on their own felt they would not be in an advantageous situation for dealing with insurance companies and ultimately obtaining insurance contracts. There was a concern that participation in managed care contracts or insurance programs would be limited to only those physicians who were part of a large group practice with whom an insurer contracted. SMSG was formed in 1992 in response to those concerns and the advent of managed care in Southeastern Massachusetts. Member physicians believed that the more physicians who joined the group, the stronger its bargaining power with insurance companies and third-party payors would be. Accordingly, application for membership was open to every physician in the Fall River community. The defendant Gregory Squillante was the Executive Director of SMSG. The defendants Americo Almeida, Christopher Lebo, Majed Mouded, Richard Perkins, James Stubbert, Elie Tawa and Henry Vicini are all primary care physicians and members of SMSG. The defendant Frederick Schnure, a specialist, *314 is a gastroenterologist who was a member of SMSG. His partner, Dr. Michael Nissensohn, is not named as a defendant in this action. Dr. Schnure’s current associates, Dr. Maddock and Dr. Sutherland, though members of SMSG, are not named as defendants. The defendant Robert Courey, a specialist, is a radiologist whose group practice, Radiologists of St. Anne’s, practices exclusively at St. Anne’s Hospital. He became a partner in SMSG in 1993, a year after its formation. The defendant Jesus Sosa, a specialist, is a general surgeon and a member of SMSG.
The founding partners of SMSG include: (1) defendant Somerset Medical Associates, Inc. with the designated representative defendants Americo B. Almeida (“Almeida”) and Elie N. Tawa (“Tawa”); (2) Majed Mouded, M.D., P.C. with defendant Majed Mouded (“Mouded”) the designated representative; (3) Rajaratnam T. Abraham, P.C. with defendant Rajaratnam T. Abraham (“Abraham”) the designated representative; (4) Somerset-Swansea Medical Center, Inc. with defendant Christopher Lebo (“Lebo") the designated representative; (5) John C. Pedrotty, P.C. with Dr. John C. Pedrotty the designated representative; (6) Richard Perkins, P.C. with defendant Richard Perkins (“Perkins”) the designated representative; (7) James Stubbert, P.C. with defendant James Stubbert (“Stubbert”) the designated representative; and (8) Fall River Family Practices, P.C. with defendant Henry Vicini (“Vicini”) the designated representative.
The specialist partners in SMSG include the following: (1) Gastro Associates of Fall River and New Bed-ford, P.C. with defendant Frederick Schnure (“Schnure”) as the designated representative; (2) a separate professional corporation with defendant Jesus Sosa (“Sosa”) and Dr. Carmela Sofia as designated representatives; and (3) Hanover Borden Cardiology Associates, P.C. with Dr. Bassen Nasser as the designated representative. The Executive Committee of SMSG included defendants Almeida, Mouded and Squillante. Squillante was the Executive Director of SMSG and was authorized to speak on behalf of SMSG and its members. Somerset Medical Associates, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts whose officers include defendants Almeida, Vicini and Abraham. Somerset ultimately became a founding partner of SMSG.
The SMSG Partnership Agreement details the compensation structure of the members of the group medical practice. As organized, each member physician was to act as a division. All revenues received by each member of SMSG belonged to the SMSG partnership. From these revenues 90% was returned to each member physician, while the other 10% was retained in a common pool to pay administrative costs, management fees and other costs incurred in operating the group practice. Specialists did not pay any separate or extra fee for referrals from the primary care physician members of SMSG. Those physicians who did mostly primary care work were denominated “gatekeepers.” The primary care physicians would receive a “gatekeeper fee” for the uncompensated extra work that they performed as a result of managed care. This extra work included telephone consultations with patients and physicians and reviewing reports from the referring physicians, none of which were previously billable.
The amount of money paid as a gatekeeper fee to the primary care physicians was proportionate to that physician’s general productivity. Gross income was used to measure general productivity. After payment of all group expenses, the balance of the funds in the SMSG pool were to be periodically distributed as bonuses to all partners including specialists. The gatekeeper fee was not referral-sensitive. The amount of money paid to a primary care physician as a gatekeeper fee was not tied to the number or value of referrals each made. No specialist member of SMSG ever paid any money directly to physicians for receiving referrals from primary care physician members of SMSG. No primary care physician member of SMSG was ever paid any money for generating referrals to specialist members of SMSG. There was no policy, official or unofficial, written or tacit, requiring SMSG member physicians to refer patients exclusively to those specialists who belonged to SMSG.
There were 25 partners in SMSG. They included the following physicians: Drs. Abraham, Ali, Almeida, Angelí, Courey, Diamant, Gennaoui, Kimball, Lebo, Maddock, Mendes, Mouded, Nasser, Nissensohn, Pedrotty, Perkins, Schnure, Sofia, Sosa, Sousa, Stubbert, Sutherland, Tawa, Vicini and Zuehlke. The defendant Dr. Schnure, as early as 1987, was discussing the possibility of forming a multi-group practice. He had discussions with Dr. Almeida in 1987 and was offered an employment contract that he declined. In 1990 and 1991, Dr. Schnure retained a health consultant and attorney to obtain advice with respect to forming a multi-group practice. Dr. Schnure discussed the group practice formation with other physicians, including the plaintiff Dr. Boman. From the time of his arrival in Fall River in 1988 through the formation of SMSG in 1992, the plaintiff chose not to associate with any group medical practice.
In approximately April 1992 the defendant Squillante had a meeting with the plaintiff, Dr. Boman. Squillante explained the background for the formation of the SMSG group practice in the context of the onset of managed care and how the group practice would operate, including the compensation structure of the partnership. Squillante never threatened Dr. Boman with the loss of referrals if he did not join SMSG nor did he admonish Dr. Boman that his practice would not survive if he failed to join this group. Squillante did say that he thought Dr. Boman’s practice as a solo practitioner would falter (or would not thrive) under *315 the new managed care environment and that eventually Dr. Boman would have to join some group — either a vertically or horizontally integrated group — or become an employee of a hospital. Squillante told Dr. Boman that, in the context of managed care, if the group obtained managed care contracts and the plaintiff was not a member of the group, referrals to him could be restricted by the managed care contract. Squillante’s comments were not directed to Dr. Boman specifically. Squillante was attempting to demonstrate the wide-ranging ramifications of the advent of managed care and what it would mean to all of the physicians in the Fall River area. Although SMSG did not employ an exclusive referral pattern during the time it was in operation, the possibility that an insurance company might prohibit referrals to nonmember physicians was discussed in meetings pertaining to the formation of SMSG. Dr. Boman was never told that if he joined the group, his referrals from group members would increase. No SMSG member physician ever told Dr. Boman that the continued referral of patients to him would be conditioned on his joining the SMSG group practice. Dr. Boman ultimately chose not to join the group because he found the terms of membership disfavorable. At no time was Dr. Boman excluded from membership in SMSG.
Squillante explained SMSG’s compensation structure at a public meeting in August 1993. The compensation structure was as follows: (a) each physician would be considered a profit center; (b) the SMSG group practice collected the total amount of each member physician’s receipts; (c) both primary care physicians and specialists received 90% of the receipts generated by his/her own area of practice; (d) the other 10% would be retained in a common pool to pay costs and expenses in operating the group practice; after expenses were paid, the SMSG primary care physicians were paid a gatekeeper fee based upon the physician’s gross revenues; (e) the remainder was returned to the physicians: 70% to the primary care doctors, 30% to the specialists.
There was no policy, official or unofficial, written or tacit, restricting SMSG member physicians from referring patients only to those specialists who belonged to SMSG. No SMSG member physician ever threatened Dr. Boman with the loss of referrals if he did not join the partnership.
Both before and after the formation of SMSG, if a patient specifically requested a particular specialist, SMSG primary care physicians sent their patients to that doctor. Accordingly, if a patient specifically requested Dr. Boman for a surgical procedure or consult, that patient would be referred to Dr. Boman. Otherwise, each primary care physician chose specialists based on a variety of criteria. These criteria included, but were not limited to, the gender of the patient, the hospital to which the patient would like to be admitted, the nature of the problem, and a prior relationship with a particular specialist.
SMSG was a multi-specialiy group medical practice serving the greater Fall River area. The partnership was composed of primary care and subspecialty physicians, such as surgeons, radiologists, gastroenterologists, cardiologists and psychiatrists, ten of whom are named individually as defendants. The 1992 presidential elections involved a great deal of discussion concerning national health care. In fact, President Clinton in 1993, under the auspices of Mrs. Clinton, created a health care task force to bring about national health insurance, all of which caused concern and uncertainty within the medical community.
Prior to the formation of SMSG, only four primary care physicians who were members of SMSG (Drs. Lebo, Stubbert, Mouded and Perkins) consistently referred patients to Dr. Boman. In addition, the plaintiff received a number of surgical referrals from Dr. Schnure, a gastroenterologist. None of the following named defendants made consistent referrals to Dr. Boman at any time before or after SMSG was formed: Drs. Abraham, Almeida, Courey, Sosa, Tawa and Vicini. Dr. Courey, a specialist (radiology), and Dr. Sosa, a specialist (surgery), normally do not make referrals to Dr. Boman, a specialist (surgery).
The “referring” defendant physicians (Drs. Lebo, Stubbert, Mouded, Perkins and Schnure) comprised approximately 40% of the plaintiffs referral base. However, not one of these doctors was aware that they comprised such a large portion of Dr. Boman’s referrals. After the plaintiff declined membership in the SMSG partnership in April 1992, referrals to the plaintiff from the five defendant referring physicians (Lebo, Stubbert, Mouded, Perkins and Schnure) did not decline until the 4th Quarter of 1992/1st Quarter of 1993. None of the defendant referring physicians ceased making referrals to Dr. Boman immediately after his refusal to join the group in April 1992. There were no conversations between Squillante and the SMSG doctors expressing the position that they should not refer patients to Boman. The decision to stop referring patients to Dr. Boman was made individually and independently by each of the five defendant referring physicians.
None of the SMSG member physicians communicated with each other in any manner expressing the position that they should stop referring patients to Dr. Boman for his failure to join SMSG. Each of the five individual physicians made an independent and individual decision to reduce the number of referrals to Dr. Boman without consultation with anyone within SMSG. None of the five defendant referring physicians stopped referring patients to the plaintiff because of his failure to join the group. In fact, after the formation of SMSG, each of the five defendant referring physicians continued to make referrals to non-SMSG affil *316 iated specialists, including other general surgeons who did not join SMSG.
Dr. Perkins stopped referring patients to Dr. Boman because Dr. Boman made inflammatory remarks about him and his affiliation with SMSG at a public meeting attended by other physicians in the Fall River medical community. Dr. Perkins continued to make referrals to other non-SMSG surgeons after the formation of SMSG.
Dr. Stubbert stopped referring patients to Dr. Boman because Boman had made inappropriate comments about Stubbert’s partner, Dr. Richard Perkins, and about Drs. Sosa and Sofia, SMSG surgeons. Dr. Stubbert continued to make referrals to other nonSMSG surgeons after the formation of SMSG.
Dr. Lebo stopped referring patients to Dr. Boman because his (Lebo’s) patients found Boman to be rude and arrogant and because Boman constantly wanted to provide primary care to Lebo’s patients. Dr. Lebo continued to make referrals to other non-SMSG surgeons after the formation of SMSG.
Dr. Mouded stopped referring patients to Dr. Boman because Dr. Mouded’s patients complained he was brusque and condescending to them and because Boman was openly critical of the care Dr. Mouded provided to them. Dr. Mouded continued to make referrals to other non-SMSG surgeons after the formation of SMSG.
Dr. Schnure stopped referring patients to Dr. Boman because he became arrogant and condescending toward Dr. Schnure’s patients, his staff and to Dr. Schnure himself. In addition, Dr. Schnure had heard the plaintiff make offensive comments about other members of SMSG. Dr. Schnure continued to make referrals to other non-SMSG surgeons after the formation of SMSG.
After Dr. Boman declined to join the SMSG group medical practice, the five “referring” defendant physicians at different times stopped referring surgical patients to the plaintiff. None of the SMSG physicians communicated with each other in any manner expressing the position that they should not refer patients to Dr. Boman for his failure to join SMSG.
I find that the decline in referrals from the five SMSG referring defendant physicians was not related to Boman’s failure to join the SMSG group. Each physician made a separate and independent decision about not wanting to refer further surgical patients to Dr. Boman.
Sometime during 1992 or 1993, at a business meeting of the members of the Hanover Medical Building, the plaintiff launched a vituperative verbal assault against Dr. Perkins. Dr. Boman made a number of disparaging remarks about Dr. Perkins that were circulated among the Fall River medical community. Since this incident, Dr. Stubbert and Dr. Perkins (who are partners) refer patients to Dr. Boman only if a patient specifically requests him. In addition, Dr. Boman made disparaging comments about Dr. Sosa and Dr. Sofia, two of Dr. Boman’s competitors who chose to join SMSG.
Dr. Lebo similarly concluded that it was too difficult to work with Dr. Boman because of his “rude and abrasive” manner. Also, Dr. Boman attempted to provide primary care to Dr. Lebo’s patients which was not requested by Dr. Lebo and which was more properly provided by Dr. Lebo himself, who was the primary care physician making the referrals to the surgeon plaintiff. On the sole occasion when Dr. Lebo and Dr. Boman ever spoke to each other, Dr. Boman treated him in a demeaning manner with respect to the lack of referrals. Dr. Lebo had never met Dr. Boman until the day of his trial testimony.
Initially, Dr. Mouded made referrals to Dr. Boman because Boman was a new surgeon and Mouded wanted to help him.
Each of SMSG’s primary care physicians was awarded “gatekeeper fees.” The defendants claim that “gatekeeper fees” were paid on the basis of alleged “extra work” that primary care physicians performed as “gatekeepers." The alleged “extra work” was not compensable by insurance companies. Defendants never kept any records of such “extra work,” never established any type of fee schedule with respect to such “extra work,” and never established any system for monitoring or keeping track of “extra work” that was actually performed. The “gatekeeper fee” was awarded on the basis of each primary care physician’s gross revenues. Only primary care physicians received “gatekeeper fees,” even though other physicians performed “gatekeeper" services as well. The defendants understood that financial incentives are provided primary care physicians, or “gatekeepers,” to meet cost containment goals.
In medical managed care terminology, a “gatekeeper” is a physician, usually a primary care practitioner, who makes an initial assessment of each patient’s complaint and has the authority to determine whether the patient needs treatment, and if so, either to treat the patient directly or to refer the patient to an appropriate specialist. Usually, the gatekeeper is rewarded for limiting the number of patient referrals. A valid group practice is permitted to pay “gatekeeper fees.”
SMSG is a multi-specialty medical group practice modeled on the “group practice without walls” concept and composed of primary care and specialist physicians.
The SMSG members all joined SMSG in reliance on the advice of counsel that the business organization was a valid partnership. The SMSG members also believed in good faith that SMSG was validly organized as a medical group practice that operated in compliance with all applicable laws and regulations. At all times, the SMSG members believed the gatekeeper fee *317 system complied with all applicable laws and regulations. The legal counsel of THRI gave his approval to the structure of THRI and that it satisfies all applicable laws and regulations.
At the time Dr. Courey joined SMSG in 1993, the St. Anne’s Hospital Board of Trustees approved of Dr. Courey's joining the SMSG group practice. The structure of SMSG was reviewed by counsel of Dr. Courey and St. Anne’s counsel at that time.
RULINGS OF LAW
Boman alleges that the defendants violated G.L.c. 93A by threatening to stop -refenring patients to his surgical practice if he did not join SMSG and by actually reducing referrals when Boman did refuse to join. General Law Chapter 93A, §11 provides a cause of action to:
[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as the result of the use or employment of another person who engages in any trade or commerce of... an unfair or deceptive act or practice.
G.L.c. 93A, §§2 and 11. In evaluating a Chapter 93A claim, this Court assesses: (1) whether the practice... is at least within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether the actions of the defendants caused substantial injury to the plaintiff. PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).
Section 11 of Chapter 93A does not define what conduct rises to the level of an unfair or deceptive act. Therefore, in deciding questions of unfairness under G.L.c. 93A, this court must focus on the “nature of [the] challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L.c. 93A fairness determination.” Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995).[1]
Boman argues that the SMSG partnership constituted an illegal entity which falls within the penumbra of Massachusetts law, federal law and the ethical guidelines of the American Medical Association. Boman attempts to use the Massachusetts and federal anti-kickback statutes to demonstrate illegal conduct on behalf of SMSG. Even if I were to find that the group practice created by the defendants was a technical violation of the state and federal guidelines, such a finding would not necessarily constitute a per se violation of G.L.c. 93A. Whether conduct falls within the scope of G.L.c. 93A depends upon the facts and circumstances of each case. Spence v. Boston Edison Co., 390 Mass. 604, 615 (1983); USM Corp v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 124 (1989). Even if this court were to find that the defendants were technically in violation of federal and state law when it created and maintained SMSG, this fact alone does not necessarily constitute a violation of 93A. Proof that a defendant acted illegally does not constitute a per se violation of G.L.c. 93A, §11. Mechanics National Bank of Worcester v. Killeen, 317 Mass. 100, 109 (1979); Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 505 (1997). Conversely, an act or practice authorized by statute may still be found to be an unfair or deceptive act or practice and thus violative of G.L.c. 93A, §11; Schubach v. Household Fin. Corp., 375 Mass. 133, 137 (1978).
In 1991, at the time the defendants were contemplating the formation of SMSG, the medical community faced changes and problems caused by the rise of HMOs and other group practice organizations. At that time, the health care community was struggling to respond to the growing trend toward group care and managed health care facilities. Just as the medical community was forced to cope with group and managed health care, legislatures and the AMA also reacted to the changing landscape of health care. During this period of evolution in health care, the defendant physicians attempted to establish a group practice which would satisfy state, federal and ethical guidelines.
The defendant physicians created the SMSG partnership by a written agreement which established a relationship between “physician partners” to carry on the practice of medicine. General Laws, Chapter 108A, the Uniform Partnership Act, establishes the rules for determining the existence of a partnership and, subject to any agreement among the partners to the contrary, it establishes the rights and duties of the partners. The partnership agreement of SMSG set forth the management responsibilities and the manner in which physician partners were to be expelled and new physicians were to be admitted. Initially, SMSG invited all physicians in the Fall River area, including Boman, to join the group.
The partnership agreement for SMSG also contained a formula for determining the amounts to be paid, the method of operation and the effect of dissolution. The principal factor in determining whether a valid group practice exists is the degree of shared risk involved in the organization. Under the partnership agreement, all partners were jointly and severally liable for all debts and liabilities of the SMSG partnership. In the event a patient brought a malpractice action against one of the members, all of the members of the SMSG partnership could be held jointly and severally liable. A nonreferring partner could be held responsible for the actions of a referring physician.
The partnership agreement provided that all revenues and fees generated by each physician member were the property of SMSG. These fees and revenues were deposited into the partnership accounts bearing SMSG’s tax identification number. The funds of the partnership were paid for office space, facilities, equip *318 ment, personnel and other expenses. A partner was required to contribute capital to the group in the event that funds were needed. The partnership obtained an employer identification number from the Internal Revenue Service. All invoices were in the name of the SMSG group and carried the group’s tax identification number. SMSG had a central office for the partnership’s accounting and bookkeeping services.
For these reasons, I find that SMSG was a group practice without walls (“GPWW”), a network of physicians or physician practices who were part of the SMSG entity. SMSG was an integrated model; it had a single provider number; the physicians shared risk and capital investment; and the group determined compensation methodology.
At about the time SMSG was formed, the federal government was preparing ■ legislation to streamline the manner in which Medicare and Medicaid funds were spent.[2] Congress feared that some group practices were actually mere sham organizations set up to circumvent prohibitions against remunerations in return for patient referrals. At the time SMSG began, however, the federal government had only the anti-kickback statute, 42 U.S.C. §1320a-7b(b), in place. The statute provides criminal penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration in order to induce the referral of business reimbursed by the Medicare or Medicaid programs. This offense is a felony and is punishable by substantial fines and imprisonment for up to five years. Additionally, the statute can also result in civil liability. Boman contends that the SMSG partnership operated in violation of this statute.
To violate the federal anti-kickback statute, one must “knowingly and willfully” offer to pay or accept remunerations to induce referrals. The phrase “induce” connotes the intent to exercise influence over the reason and judgment of another in an effort to cause referrals of business. I find no basis in the evidence to conclude that SMSG’s compensation structure constituted a “kickback” scheme merely because certain primary care physicians were paid “gatekeeper” fees. “Gatekeeper" fees are permitted in a multi-specialty group where primary care physicians perform a valid gatekeeper function.
The fees paid by SMSG physicians were gatekeeper fees rather than referral fees. This is evident in the manner in which the fees were assessed. Each and every physician, whether a primary care doctor or a specialist, contributed to the group pool. Under the SMSG system, specialists, as well as primary care physicians, allowed 10% of their income to be paid by SMSG into a common fund. Some of these funds were later distributed to the primary care physicians of the group. The amounts contributed were not referral-sensitive. No payments were made based on the number of referrals generated by a primary care physician. Furthermore, the gatekeeper payments were not based on the number or value of referrals made to group members. Instead, payments were made based solely on a physician’s total workload regardless of whether he or she made any referrals to a specialist group member or not.
Even if this compensation scheme was a technical violation of the terms of the complicated anti-kickback statute, the “knowingly and willfully” requirement of the statute has not been demonstrated by Boman. In United States v. Jain, 93 F.3d 436, 439-40 (1996), cert denied 117 S.Ct. 2452 (1997), the Court adopted an intent element which requires that the defendant intended to perform the act and knew that the act was wrongful. In this case, although the SMSG partners certainly knew they were engaged in a partnership, there is no evidence that they believed the enterprise was a violation of the anti-kickback statute or that it was otherwise wrongful. The entity had been structured by legal counsel and many incoming physicians had legal counsel assess the validity of the group before becoming a member. I find that all of the defendants acted in good faith in the formation of SMSG and believed that the SMSG partnership complied with the requirements of the anti-kickback statute.
As with the federal government, Massachusetts prohibits payments for referrals under penalty of fine or imprisonment. G.L.c. 175H, §3 and G.L.c. 118E, §41.[3] Little case law or guidance exists concerning the applicability of these statutes. The statutes are based on the federal anti-kickback statute. Like the federal statute, their purpose is to protect patients and their insurers from potential health care fraud. Allowing remuneration for patient referrals could lead unscrupulous physicians to order needless tests and procedures in order to increase their number of referrals. The primary difference between the federal anti-kickback statute and the state provisions is that the Massachusetts statutes do not require the action or practice to be knowing and willful. I have ruled, however, that SMSG is not a sham organization set up merely to facilitate the payment of referral fees. SMSG was sufficiently capitalized, the partners shared the risk in the entity and the physicians were not compensated based upon the number and value of referrals made to group members. The amounts paid to primary care physicians were not based on referrals; rather they were legitimate gatekeeper fees paid within the group practice.
Boman raises two related questions of medical ethics concerning the SMSG partnership. First, Boman contends that the compensation scheme represents impermissible fee splitting. Second, Boman claims that the “gatekeeper” fees were actually unethical self-referrals. Traditionally, medical ethics have condemned fee splitting arrangements between primary care physicians and specialists. Section 6.02 of the Code of Medical Ethics states as follows:
*319 6.02 Fee Splitting. Payment by or to a physician solely for the referral of a patient is fee splitting and is unethical. A physician may not accept payment of any kind, in any form, from any source, such as a pharmaceutical company or pharmacist, an optical company or the manufacturer of medical appliances and devices, for prescribing or referring a patient to a said source.
Section 6.02 also clearly sets out the rationale behind the ethical prohibition. The section states:
[Fee splitting] violates the requirement to deal honestly with patients and colleagues. The patient relies upon the advice of the physician on matters of referral. All referrals and prescriptions must be based on the skill and quality of the physician to whom the patient has been referred . . .
Code of Medical Ethics, §6.02.
Boman claims that the SMSG compensation system paid primary care physicians in return for patient referrals. The fee splitting prohibition cited by Boman does not apply to the actions of SMSG. Section 6.02 only prohibits payments made “solely for the referral of a patient.” In this case, the SMSG partnership provided for the payment of “gatekeeper” fees to primary care physicians. All parties to this litigation agree that under appropriate circumstances, the payment of gatekeeper fees is ethical and legal. Far from being based on referrals, the payments by SMSG to its primary care physicians were made regardless of the number of referrals made to SMSG specialists. The payments made to SMSG physicians were internal in nature. Such payments, if unethical, would be covered by self-referral prohibitions rather than by the general prohibition against fee splitting.
Boman claims also that the SMSG partnership engages in unethical self-referrals. Self-referrals involve physician referrals to facilities in which the physician has an ownership interest or from which they receive compensation. Essentially, Boman claims that the physicians of SMSG refused to do business with him because he would not engage in an allegedly unethical self-referral system used by the members of SMSG. In December 1991, the Council on Ethical and Judicial Affairs of the American Medical Association (“AMA”), once silent on issues such as self-referrals,[4] issued a report containing proposed guidelines regarding physician self-referrals. The report found, as a general rule, that physicians should not refer patients to health care facilities outside their office practice at which they do not directly provide care if they have an investment interest in that facility.[5]
The AMA House of Delegates initially rejected the position of the December 1991 report in June 1992. In December of 1992, however, the Delegates did vote to adopt the Council’s position set out in the report. See Marc A. Rodwin, Medicine, Money & Morals (1993). Boman suggests that he did not join SMSG because the group engaged in unethical self-referrals. He argues that it is manifestly unfair to punish a physician by stopping referrals merely because he refused to join an unethical group practice. This argument fails because at the time Boman refused to join SMSG, in April 1992, the AMA House of Delegates had announced that self-referrals were ethical as long as disclosure was made to the patient. See Arnold Reiman, Self-Referral — What’s At Stake, 327 New Eng. J. Med. 1522 (1992). It is undisputed that SMSG advertised as a group practice and disclosed to patients that it operated as a group practice.
The fee-splitting and self-referring prohibitions unquestionably exist to protect patients. To the extent that Boman attempts to use these ethical prohibitions to demonstrate a violation of Chapter 93A, his claims must fail*. The mere fact that a person or entity acts in a manner contrary to an ethical guideline does not constitute an automatic Chapter 93A violation. See generally, McCann v. Davis, Malm & D’Agostine. P.C., 423 Mass. 558 (1997).[6] The ethical guidelines cited by Boman were designed to protect patients, rather than physician competitors. For this reason, a technical violation of an ethical rule would not warrant a Chapter 93A claim brought by Boman.
Boman’s assertion that it is manifestly unfair to retaliate against a person based solely on his refusal to join an unethical group raises a closer Chapter 93A legal issue. Nevertheless, I find and rule that at the time Boman refused to join SMSG, the group practice did not violate any ethical guidelines of the medical profession.[7] The fee splitting prohibition of Section 6.02 does not apply to the gatekeeper fees paid by SMSG to the primary care physicians in the group. Additionally, the self-referral guidelines, even if applicable to SMSG, were not adopted by the AMA until after Boman refused to join the group. For this reason, Boman cannot now claim that his refusal to join SMSG was based on the AMA’s prohibition against self-referrals.
The state, federal, ethical prohibitions against payments for referrals were enacted to ensure that physicians acted in the best interests of their patients. Legislatures were concerned that primary care physicians might order unnecessary tests and surgeries in order to increase referral payments. The clear intent of the state and federal statutes is to protect the patient consumer and the public and private insurer from the high costs of unnecessary tests and medical procedures. Similarly, the AMA’s ethical guidelines clearly seek to ensure that the patient’s health and well-being are always the primary concern of the attending physician. Boman attempts to demonstrate that SMSG violated one or all of these rules and that he suffered injury because of the violation. Boman, however, has failed to demonstrate that the alleged violations of statute or ethical rule bore any causal relationship to his loss of referrals.
*320 The flexible set of guidelines as to what should and should not be considered a violation of G.L.c. 93A, “suggests that the Legislature intended the terms ‘unfair and deceptive’ to grow and change with the times.” Nei v. Burley, 388 Mass. 307, 313 (1983). While this court must examine whether an act or practice comes within the penumbra of a statutory or ethical prohibition, a finding that a statutory or ethical violation may have occurred does not end this Court’s inquiry. The mere fact that the defendants may have violated state laws and AMA ethical guidelines designed to protect patients does not grant Boman, a competing physician, the right to recover for a Chapter 93A violation. The fact that SMSG may have -violated a statute or ethical guideline designed to protect patients and their insurers is not enough, in and of itself, to demonstrate a Chapter 93A violation against Boman, a competitor. See Action Ambulance Service, Inc. v. Atlanticare Health Services, Inc. 815 F.Sup. 33 (D.Mass. 1993).
Boman challenges the conduct of the defendants in two respects. First, Boman alleges that Squillante threatened to cut off referrals from members of the group if Boman refused to join. This Court finds, however, that no such threats were ever made by Squillante. Second, Boman claims that the members of SMSG unfairly retaliated against him for refusing to join the group by reducing the numbers of referrals that he received from members of the group.
The defendant physicians did not set up and maintain SMSG in an attempt to somehow extort money from Boman or unfairly force business away from Boman. SMSG arose as a response to the rise of managed care facilities in and around Southeastern Massachusetts. The defendant physicians were faced with uncertainties regarding the future of medical health coverage. The defendants created SMSG to offer a competitive alternative to other managed care groups and to provide comprehensive health care in the Fall River area. Boman alleges that the group acted unfairly, unethically and maliciously to cut referrals made to him by group members.
I rule that SMSG and all of the other defendants did not retaliate against the plaintiff for his refusal to join the group by reducing the number of patients referred to Boman by members of the group. The plaintiff did not join all of the members of SMSG in this suit, but arbitrarily sued physicians who exercised no control over referrals made by the five referring physicians. Boman failed to produce any credible evidence as to the liability of the following defendants who were not, at any time, referral sources of the plaintiff: Drs. Abraham, Almeida, Courey, Sosa, Tawa and Vicini. Similarly, there is no evidence to support the liability of either Somerset Medical Associates or THRI, PC.
With regard to the physicians who did refer patients to Boman but later curtailed their referrals, I find that the drop-off in referrals came as the result of the personal and professional differences between the plaintiff and the defendants which I have set out in the findings of fact. Much of the reason for the reduction in the number of referrals was attributable to the plaintiffs attitude and derogatory comments made by Boman regarding physicians in the SMSG partnership. The defendants were under no legal duty or obligation to refer patients to Boman. In fact, it is admitted by all parties that referrals are frequently based upon personal likes and dislikes as well as on the referring physician’s assessment of the skill and competence of the specialist to whom the referral is being made.
In this case, Drs. Lebo, Stubbert, Mouded, Perkins and Schoure all referred to Boman before 1992, but curtailed their referrals sometime after April 1992, when Boman refused to join the group. Boman has not shown by a preponderance of the evidence that any loss in referrals was related to his decision not to join SMSG. All of the referring defendants stopped referring or reduced the number of their referrals to Boman at different times. None of the physicians knew that the others had reduced their number of referrals to Boman and there was no organized plot to reduce referrals or even any conversations to that effect. Additionally, Boman did not experience any drop in referrals until late 1992 or early 1993, several months after he refused to join SMSG. All of the defendants who reduced the number of referrals to Boman offered plausible and reasonable explanations as to why they stopped referring to Boman during the period in question. Finally, despite Boman’s contention that SMSG physicians stopped referring patients to him because he would not join the group, all five physicians who stopped referring to Boman continued to refer patients to other physicians who were not members of SMSG. For the above-stated reasons, this court must rule that no violation of G.L.c. 93A was committed by the defendants with regard to Dr. Boman.
ORDER
For the foregoing reasons, it is hereby ORDERED that Judgment enter in favor of the defendants.

In Propac-Mass, Inc. the Supreme Judicial Court criticized the previously used “level of rascality” test set out in Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979), as “uninstructive.” Similarly, the Court also rejected tests such as the “rancid flavor of unfairness” test set out in Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992).

This legislation, which became effective on Januaiy 1, 1995, is commonly known as Stark II, 42 U.S.C. §1395nn.

G.L.c. 118E, §41 was formerly codified as G.L.c. 118E, §21B.

American Medical Association, Council on Ethical and Judicial Affairs, Report of the Council on Ethical and Judicial Affairs: Conflicts of Interest (1986).

Report of the American Medical Association Council on Ethical and Judicial Affairs, Report C (1-91), December 11, 1991, with clarifications published in Council on Ethical and Judicial Affairs, American Medical Association, Conflicts of *321 Interest: Physician Ownership of Medical Facilities, 267 JAMA 2366-2369 (1992).

In McCann an attorney was found to have violated the Rules of Professional Conduct, but the Court still found no violation of Chapter 93A. Although Boman cites several cases in which a violation of Chapter 93A was found based on an ethical violation, the existence of an ethical violation does not, in and of itself, constitute a violation of Chapter 93A.

At the time Boman refused to join the group in April of 1992, the guidelines suggested in the report of the Council on Ethical and Judicial Affairs had been rejected by the AMA House of Delegates. It was not until December of 1992 that the Delegates adopted the report’s guidelines.