van Gestel, J.
This matter comes before the Court on a jury-waived trial of Counts I and IV of the complaint. These two counts seek declaratory relief regarding the meaning of the word “supermarket” as used in a certain lease (Count I) and the right to exercise a certain “right of first refusal” relating to property adjacent to the leased premises (Count IV). The remaining counts of the complaint are reserved until after Counts I and IV are finally resolved.
FINDINGS OF FACT
The plaintiffs Stanley Slawsby and Judith Slawsby (collectively, the “Slawsbys”), reside in Newton, Massachusetts. For all purposes of this case, the Slawsbys have been, and still are, the owners of all of the capital stock of the remaining plaintiff Capitol Food Corp. of Fields Comer (“Capitol”).
Capitol operates a supermarket at 500 Geneva Avenue in the Dorchester section of Boston (the “Premises”).
The defendants Paul J. Cifrino and Thomas M. Cifrino are Massachusetts residents. They currently are Tmstees of Fields Station Realty Trust under a Declaration ofTrust dated October 15, 1973, and duly recorded in the Suffolk County Registry of Deeds in Book 8669, Page 147 (the “Trust”).
At all material times, and continuing to the date of the trial in this case, the Trust has been the owner of the Premises, which is approximately 21,000 square feet of a Mall (the “Mall”) owned by the Trust. The Mall has approximately 14 currently occupied tenant spaces, of which the Premises is the second largest.
Since October 1996, Capitol has operated a supermarket at the Premises pursuant to an Indenture of Lease (collectively with its amendments, the “Lease”) dated January 7, 1965, originally by and between Paul J. Cifrino, John P. Cifrino and James P. Cifrino, Tmst-ees of Fields Station Realty Trust[2] as Landlord and Supreme Fields Comer, Inc. as Tenant. The Lease was amended three times: First Amendment of Lease, dated February 1, 1968; Amendment of Lease, dated January 8, 1982; and Second [sic] Amendment[3] to Lease, dated November 13, 1985.
When originally executed, the Lease contained a number of provisions favorable to the Tenant. This is not surprising, as the Cifrino family, which included the Tmstees of the Trust which was the Landlord, also was the owner of the original supermarket tenant, one of the “Supreme Market” chain of stores.
As originally executed in January 1965, the Lease had a term of 20 years, with two successive options for the Tenant to extend for 10 years each. The February 1, 1968, First Amendment of Lease changed the extension options in favor of the Tenant, from two successive options of 10 years each to six such successive options of 10 years each, thus making it an 80-year lease from 1965 to 2045.
The following are certain significant portions appearing in the original Lease and its amendments.

Lease, Article VII, Sec. 1.

The portion of the demised premises marked “Supermarket” on said Exhibit A shall be used only for the conduct thereon of a supermarket business, which business may include the sale of such items as are presently sold, or as may be sold from time to time by Tenant in its stores, or by its competitors or any of them conducting similar businesses, except as restricted by the provisions of Article VII, Section 4 (C) of the lease from the Landlord to Stop & Shop, Inc. demising premises in the Shopping Center (“Stop & Shop lease”) . . [4]

Lease, Article XI.

Tenant shall have the right to assign the lease or to make any sublease of the demised premises, or any portion thereof subject always to the terms of this lease, including without limitation the provisions of Article VII hereof. Notwithstanding any such assignment or sublease, Tenant shall remain fully liable on this lease.

Lease, Article XVIII, Sec. 14.

*406 This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect. This lease shall not be modified in any way except by a writing executed by both parties. The attached Appendix is a part of this lease.

Amendment of Lease, January 8, 1982, Sections 1 and 2.

1. Notwithstanding the terms of the Lease which permit Tenant to assign or sublet without obtaining Landlord’s consent, Landlord’s prior written consent to the assignment of this Lease or the subletting premises occupied by Tenant’s supermarket shall be required if (a) Tenant desires to assign this lease or sublet such premises for use other than a supermarket for a term which commences after or extends beyond the initial term of the Lease, (b) such assignment or subletting is to a non-affiliated party and (c) Tenant paid or was obligated to pay percentage rent during either of the preceeding two lease years. In the event Landlord’s consent is required pursuant to the provisions of this Section, the provisions of Sections 2-10 below shall apply.
2. Tenant shall give Landlord notice of its intent to so assign this Lease or sublet such premises at least thirty (30) days prior to the proposed execution of such assignment or sublease. Such notice shall set forth the name of the proposed assignee or subtenant, the intended use of the leased premises, and the rent or other consideration to be paid by such assignee or subtenant and all other financial details of the proposed transaction.
Over the years leading up to October 1996, when Capitol became the Tenant under the Lease, the prior tenants were first a Supreme Market and then a Purity Supreme Market.
When Capitol took over the Premises, it executed an Assignment and Assumption of Lease, dated September 9, 1996, with PSLP Realty Corp., the latter being the then holder of the Landlord’s and Tenant’s interests in the Lease. Included in the Assignment and Assumption of Lease, as Section 3, is the following:
Confirmation of Use Provision. The parties hereto hereby confirm that, notwithstanding anything to the contrary contained in the Lease (and any amendments thereto), express or implied, including without limitation, Section 9 of that certain Amendment of Lease dated January 8, 1982 (the “First Amendment”),[5] the supermarket portion of the Demised Premises shall be used only for the conduct of a supermarket business consistent with the provisions of Article VII of the original lease document dated January 7, 1965. The First Amendment contains specific provisions for the Landlord’s consent in the case of certain proposed assignments of the lease or sublettings of the Premises for use other than as a supermarket, which are not intended to be altered by this provision and remain in full force and effect.
Section 9 of the January 8, 1982, Amendment of Lease addressed instances in which the Tenant might use the Premises “for non-supermarket purposes.” It recites methods for the Landlord and Tenant reaching agreement on percentage rental payments in such circumstances. This situation is not a matter in issue in this case.
In the fall of2000, Capitol’s principal supplier — and an entity with secured interests in Capitol’s business — began to aggressively press for payments on outstanding debt. As a result, Stanley Slawsby began a series of meetings with Paul Cifrino, seeking advice and assistance with the financial aspects of Capitol’s business. Paul Cifrino was a friend and also was highly regarded as one of the original leaders in the supermarket business in the Boston area.
Among other things discussed between Stanley Slawsby and Paul Cifrino was the possible expansion of the Capitol Market. Capitol, at that time, as it is today, was about 20,000 square feet smaller than the optimal size for a supermarket in the Boston area. There was a meeting on October 10, 2000, at which Stanley Slawsby told Paul Cifrino that he — Slawsby— wanted to show his pressing creditor that Capitol had a right to expand its store space. Paul Cifrino offered and sent a letter to Stanley Slawsby, dated October 11, 2000, on the letterhead of “Cifrino Realty Trust.” The substantive part of the letter reads:
This letter will confirm and record our understanding regarding additional area for your supermarket operation at the Fields Comer Shopping Center. This operation occupies about 20,000 square feet of space and the Bradlee store has about 50,000 feet of total area. The Bradlee lease expires at the end of the year 2005 and may, possibly, terminate sooner.
Should the Bradlee tenancy terminate, either at the end of the present lease or sooner, we shall offer your Capitol Food store a first refusal on up to 20,000 feet of the area currently occupied by Bradlee for expansion of the Capitol Food store area.
This is a firm commitment.
With eveiy good wish.
/s/ Paul Cifrino
Trustee, Fields Station Realty Trust
Stanley Slawsby neither paid for, nor granted to Paul Cifrino anything in return for, the foregoing letter. Nor was there any evidence presented that the Slawsbys or Capitol did or took, or declined to take, any action in reliance upon the letter.
The other major tenant at the Mall was a Bradlee’s Department store. It was located immediately adjacent to Capitol, such that the two stores shared a common wall. Bradlee’s went into bankruptcy and closed its store at the Mall early in 2001. This closing seems to *407 have had a serious adverse effect on Capitol’s financial operations. Capitol’s business dropped by almost 15% after the Bradlee’s closing, and its financial losses have continued to date.
In the late spring of 2001, Winvest Investment Company LLC, an entity that operates five “Super 88 Markets” in the Boston area (“Super 88”), through a broker, contacted Paul Cifrino expressing an interest in becoming a tenant at the Fields Comer Mall. Cifrino referred Super 88’s broker to the Slawsbys. Thereafter, there was some communication between Super 88 and the Slawsbys, but those initial conversations went nowhere because the amounts of money Super 88 proffered were, in the Slawsbys’ view, far too low.
Super 88 began its business in the Boston area with a store in the Chinatown section of the city. It has since expanded, with stores at South Bay Mall just west of the Southeast Expressway in the Dorchester/South Boston area, in Allston near the intersection of Commonwealth and Brighton Avenues, at a new store being developed in Quincy, and at another location in Boston on Herald Street.
On May 26, 2003, the Court, along with counsel for the plaintiffs and counsel for the defendants, took a view. Included in the view, in the order stated, were the Capitol Market at Fields Corner, the Super 88 at South Bay and the Super 88 in Allston. In the view, the parties toured each market fully, walking up and down each aisle in the stores, examining the layouts and the products for sale.
As Capitol’s financial picture darkened, its negotiations with Super 88 resumed. Finally, on April 30, 2002, the Slawsbys entered into an agreement with Winvest Investment Company LLC for the sale of 100% of the stock of Capitol Foods Corp. of Fields Corner. The transaction was contingent upon the buyer being successful in gaining the additional 20,000 square feet of space in the adjacent former Bradlee’s premises. The Slawsbys, under the agreement, were to be paid $1 million in cash, $750,000 paid over time, and an assumption of another $800,000 in liabilities.
Shortly thereafter, Super 88, through its brokers, began discussions with Paul Cifrino, regarding the agreement with the Slawsbys and the desire of Super 88 to exercise the option for the additional 20,000 square feet of space in the Bradlee’s location. In this regard, by letter dated May 14, 2002, Super 88 proposed three different scenarios to Paul Cifrino: (1) a 20.000 square foot option expansion into the space adjacent to Capitol; (2) a lease of the entire adjacent 50.000 square feet; and (3) a purchase or long-term master lease for the entire property at the Mall.
Paul Cifrino did not accept any of Super 88’s proposals. In fact, fairly soon after they were made, Paul Cifrino, though his attorney, sent two abmpt and unexpected notices to Capitol. Both notices came by certified mail and both were dated May 30, 2002. The first notice charged Capitol with certain deficiencies with regard to the payment of percentage rent. It claimed a default in such payment in the amount of $33,451.
The second notice related to the Super 88 transaction. It read as follows:
As you know, we represent Paul J. Cifrino, as he is Trustee of Fields Station Realty Trust, your landlord under the Lease. Article VII of the Lease requires that the portion of the demised premises marked “supermarket” on Exhibit “A” to the Lease shall be used only for the conduct thereon of a supermarket business.
Article XI of the Lease permits Tenant to assign the Lease subject to the terms thereof, provided that Tenant remains fully liable thereunder. However, pursuant to para. 1 of the Amendment of Lease dated January 8, 1982 (the “1982 Amendment of Lease”), notwithstanding the terms of the Lease permitting Tenant to assign or sublet without first obtaining Landlord’s consent,
Landlord’s prior written consent to the assignment of this Lease, or the subletting of the premises occupied by the Tenant’s supermarket shall be required if (a) Tenant desires to assign this Lease or sublet such premises for use other than as a supermarket for a term which commences after or extends beyond the initial term of the Lease, (b) such assignment or subletting is to a non-affiliated party, and (c) Tenant paid or was obligated to pay percentage rent during either of the preceding two lease years.
Landlord has recently been advised by representatives of Super 88 (operators of one or more oriental specially markets) of Super 88’s desire to take an assignment of the lessee interest in the Lease, or to enter into a sublease of the demised premises. In view of the fact that Super 88 operates oriental specialty markets, Notice is hereby given that any such assignment or subletting would be prohibited and therefore void without your first obtaining Landlord’s prior written consent in the manner prescribed by paras. 2-10 of the 1982 Amendment of Lease.
On August 12, 2002, the Slawsbys and Super 88 entered into a second agreement with financial terms essentially identical with the April 30, 2002, agreement. This second agreement, however, eliminated the contingency that Super 88 reach a monetary agreement with the Cifrino interests as to the right of first refusal for 20,000 square feet in the Bradlee property and substituted a contingency that either the Cifrino interests come to agreement that a Super 88 may utilize the Capitol premises or the Slawsbys obtain an order “from a court of competent jurisdiction” that a) a Super 88 is a “supermarket” as permitted in the Lease and b) that the Cifrino interests must honor the right of first refusal for the additional space.
*408 No agreement having been reached between Super 88 or the Slawsbys and the Cifrino interests, this lawsuit followed on March 31, 2003.
On the issue of whether the Super 88 store proposed to acquire the Capitol premises at the Mall at Fields Comer is a supermarket, the Slawsbys presented an expert witness. The witness was Gene Arlin German (“Prof. German”), who holds the position of Robert G. Tobin Professor of Food Marketing, in the Department of Agricultural Economics at Cornell University. Prof. German holds a B.A. degree in Economics from Michigan State University, an M.S. degree in Marketing from Cornell University and a Ph.D. in Marketing also from Cornell. Prof. German is highly qualified and provided competent testimony on issues relating to the United States supermarket industry, including its history and evolution from shortly after WWII to the present.
Prof. German testified — and this Court accepts that testimony — that the current definition in the industry of a supermarket is: “A self-service retail food store, with annual sales of $2 million or more, which contains basic departments offering groceries, meat, fish, produce, dairy products and frozen foods.”
Like the Court, Prof. German visited and viewed the South Bay and Allston Super 88 stores. In his opinion — with which this Court, as a lay person, agrees— those stores fit the recognized definition of a “supermarket.” The Super 88s are laid out in typical supermarket fashion, with aisles of shelves carrying a wide variety of foods, with a fresh produce section, with a very large rice and grains section, with a meat department, with an extraordinary fresh seafood department, with dairy products and frozen foods. Customers enter at the front and perambulate the aisles and peruse the departments with shopping carts or baskets and serve themselves. The customers then exit through a series of cash register check-out counters, also at the front of the stores.
The only thing noticeably different in Super 88 stores from conventional supermarkets with which this Court is familiar is the fact that there is a heavy— but by no means total — emphasis on Asian foods and products. There was, however, a clearly discernable difference in the mix of products at the Allston store from that at South Bay. The Allston store had a larger amount of “traditional” American foods, and a considerably larger amount of Hispanic-branded foods than was seen by the Court at South Bay.
In Prof German’s opinion, the mix of foods proffered is not the determining factor as to whether a store is a supermarket, so long as there is some general mix of traditional offerings. He described heavily Hispanic-oriented markets in Texas and California, and referenced Bread and Circus stores and Trader Joe’s locally, each of which, he said, fit the definition of a supermarket. In Prof. German’s opinion, Super 88’s Asian emphasis does not exclude it from the industry definition of a supermarket.
RULINGS OF LAW
Count I and Count IV in this matter present claims appropriate for declaratory relief. See, e.g., Scirpo v. McMillan, 355 Mass. 657, 661 (1969); Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 495 (1997).
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract or lease language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998); President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 891 (2003). A lease provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of lease language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the [Lease] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct 108, 116 (1989). The Court must act in a way to give effect to the Lease as a rational business instrument in order to cany out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract or lease. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Lease in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr, supra, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
“[DJoubts as to restrictions [in a lease] are to be resolved in favor of the tenant.” Mutual Paper Co. v. Hoague-Sprague Corp., 297 Mass. 294, 301 (1937).
Here, where both the original Landlord and the original Tenant, all acting through the same members of the Cifrino family and who are sophisticated and knowledgeable parties, chose to embody their agreement for the supermarket tenancy in issue in a detailed and carefully crafted written Lease, perhaps more than in other situations they are entitled to and should be held to the contractual language they chose. The Court itself must be careful not to impose its own views on the contracting parties or to let matters outside the four comers of the instrument modify its expressed statements. “Courts *409 cannot . . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
In making the declaration sought in Count I, the Court must start with the documents, principally the Lease and its amendments. Looming very large is Article VII, Section 1, of the Lease. With emphasis added, it reads in material part:
The portion of the demised premises marked “Supermarket” on said Exhibit A shall be used only for the conduct thereon of a supermarket business, which business may include the sale of such items as are presently sold, or as may be sold from time to time by Tenant in its stores, or by its competitors or any of them conducting similar businesses.
The Court can only look to the words used in the Lease documents in the context in which they are used. This is because, among other things, the drafters of the Lease and those who first executed it included a broadly worded integration clause in Article XVIII, Section 14, that reads in material part:
This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.
Thus any oral statements of the parties, or others, as to their understanding of the meaning of the words chosen ought not be considered.
Although the word “supermarket” is not defined in the Lease, it is essentially one of those self-defining words that needs no assistance from a draftsman, unless, of course, what was intended was something different from what the ordinary definition might include. A current dictionary definition, for example, is: “A departmentalized self-service chain or independent retail market that sells foods, convenience goods, and household merchandise arranged in open mass display.” Webster’s Third New International Dictionary (c. 1986). There is no limiting language in the Lease, nor is there any ambiguity. See, by way of contrast, Kobayashi, supra, 42 Mass.App.Ct. at 496.
In this context, the Court observes that this Lease, as amended, contemplated a life-span of 80 years. And the business in issue operated within a dynamic and evolving industry. Consequently, it would be legally inappropriate for this Court to read the Lease language to be frozen in time as of the date of its execution in 1965. The “supermarket business” as referenced in Article VII, Section 1, is not said to be so petrified. The very clause in issue includes language referring to “such items as are presently sold, or as may be sold from time to time,” and that reference is not limited just to what is sold from time to time at the premises. It also includes what is sold from time to time “by any [competitors] conducting similar businesses.”
It seems significant to the Court that the language just discussed — and which the defendants suggest is such as would limit the definition to a “conventional” supermarket — begins with the words “may include,” not “shall include.” Can the use of the word “may” be said to mandatorily modify or limit the preceding phrase, “a supermarket business?” The draftsman of the Lease could readily and easily have said: “The premises shall be used only for the conduct thereon of a conventional supermarket business of the kind being operated on the date of the execution of this Lease, as such business may itself evolve over the term hereof,” or other similar limiting language. The draftsman, however, chose not to provide such a narrow constraint on the Tenant. This Court is disinclined to insert such a limitation as well. “(T]he proper course is to enforce contracts according to their plain meaning and not to undertake to be wiser than the parties, and therefore . .. they will be taken to mean what they say and will be held to their word.” Guerin v. Stacy, 175 Mass. 595, 597 (1900) (Holmes, C.J.).
Nor should it pass without notice that nowhere in the Lease, or any amendment thereof over the first nearly 40 years of its existence, has the Landlord insisted upon, or been given, any right or authority to dictate to the Tenant its product mix, the kinds or ethnicity of the products it would sell, the percentages of shelf-space or floor-space for any particular products, or in any other way to interfere with the Tenant’s choices in connection therewith.
The Super 88 stores in South Bay and Allston that this Court observed on the view are each “a supermarket business” as that phrase is used in Article VII, Section 1, of the Lease. There is nothing in the Lease, or any amendment thereto, that warrants a different conclusion or ruling. As a consequence, the Slawsbys do not need the Landlord’s assent to a transfer of their stock in Capitol to an entity that intends to run a Super 88 supermarket like that seen on the view in Allston.
The October 11,2000, letter from Paul Cifrino to Stanley Slawsby regarding the “first refusal on up to 20,000 feet of the area currently occupied by Bradlee for expansion of the Capitol Food store area” was an option. “An option is simply an irrevocable offer creating a power of acceptance in the optionee . . . Therefore, no duly to perform arises in the optionor until the optionee accepts the irrevocable offer embodied in the option.” Stapleton v. Macchi, 401 Mass. 725, 729 n.6 (1988). See also, The Tristram’s Group, Inc. v. Morrow, 22 Mass.App.Ct 980, 981 (1986).
“An option given without consideration [, however,] is revocable at any time by the offeror.” Pearl v. Merchants-Warren National Bank of Salem, 9 Mass.App.Ct. 853, 854 (1980).
The essentials of consideration are summarized in Williston, Contracts (3d ed.) sec. 102A: “[Legal detriment] means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something *410 which he was privileged not to do, or not to refrain from doing. Benefit correspondingly must mean the receiving as the exchange for his promise of some performance or forbearance which the promisor was not previously entitled to receive.”
Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority, 357 Mass. 40, 42-43 (1970).
Neither the Slawsbys, nor Capitol, in return for the October 11, 2000, letter from Paul Cifrino, gave up something which immediately prior thereto they were privileged to retain, or did or refrained from doing something which they were privileged not to do, or not to refrain from doing. Nor did Paul Cifrino, or the Trust, receive as the exchange for his letter some performance or forbearance which he was not previously entitled to receive.
In short, in the traditional sense, there was no consideration for the October 11, 2000, letter.
The Slawsbys argue, however, that the doctrine of promissory estoppel can serve as a substitute for traditional consideration in support of an option contract. They cite to Restatement (Second) of Contracts, Sec. 87(2), which reads: “An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice.”
The Slawsbys also cite to three cases in support of their position. Teitelbaum v. Hallmark Cards, Inc., 25 Mass.App.Ct. 555 (1988); McAndrew v. School Committee of Cambridge, 20 Mass.App.Ct. 356 (1985); and Greenstein v. Flatley, 19 Mass.App.Ct. 351 (1985).
Unfortunately, there is no credible evidence that the Slawsbys, or Capitol, took any action whatsoever as a result of receiving the October 11, 2000, letter. Any upgrading of the store occurred before the letter was ever discussed, and any moneys that the Slawsbys themselves may have lent to Capitol were because of their interest in preserving the store for their son Stuart, and provided no benefit whatsoever to Paul Cifrino or the Trust. In short, there is nothing upon which to predicate a ruling of a substitute for consideration on a promissory estoppel theory.
For what little it may be worth, this Court finds and rules that the October 11, 2000, letter was not limited to Stanley Slawsby personally. It expressly recites that the first refusal is “offer[ed to] your Capitol Food store.” Further, there is no express prohibition against assigning the option, and consequently, if it has not been impaired for lack of consideration and the revocable nature that that situation permits, it could be assigned to an appropriate successor. See, e.g., American Employers' Ins. Co. v. Medford, 38 Mass.App.Ct. 18, 22 (1995).
ORDER FOR JUDGMENT
Based upon the foregoing findings of fact and rulings of law, this Court orders judgment for the plaintiffs on Count I of the complaint and judgment for the defendants on Count IV of the complaint, and directs that the following declarations and injunctive order be entered as part of the judgment:
1. A Super 88 Market, such as that at or near the intersection of Commonwealth Avenue and Brighton Avenue, in the Allston section of Boston, is a “supermarket” within the meaning and constraints of Article VII, Section 1, ofthe Indenture of Lease dated January 7, 1965, by and between Paul J. Cifrino, John P. Cifrino and James P. Cifrino, Trustees of Fields Station Realty Trust, as Landlord, and Supreme Fields Comer, Inc. as Tenant, as such Lease has been amended by amendments dated February 1, 1968, January 8, 1982 and November 13, 1985;
2. The plaintiffs and their successors do not have an irrevocable right to exercise the right of first refusal for up to 20,000 square feet of space adjacent to the Capitol Supermarket at 500 Geneva Avenue, in the Dorchester section of Boston, as set forth in the letter dated October 11, 2000, from Paul Cifrino to Stanley Slawsby, solely for the reason that there is no consideration, or substitute for consideration, for the option appearing in such letter; and
3. The defendants are enjoined and restrained from terminating the Lease for the supermarket premises at 500 Geneva Avenue, in the Dorchester section of Boston, or otherwise from interfering with the tenant’s use of the Premises (i) as a Super 88 Market, such as that at or near the intersection of Commonwealth Avenue and Brighton Avenue, in the Allston section of Boston, (ii) as a supermarket that emphasizes and concentrates in the sale of Asian foods, or (iii) due to any change by Capitol of its product line, so long as Capitol remains a self-service retail food store, with annual sales of $2 million or more, which contains basic departments offering groceries, meat, fish, produce, dairy products and frozen foods, regardless of the ethnic or geographic orientation of the products sold thereat. The parties are requested to confer and advise the
Court whether either of them desires a determination and direction by the Court pursuant to Mass.R.Civ.P. Rule 54(b), together with a Report to the Appeals Court pursuant to Mass.R.Civ.P. Rule 64. If not, then the Court seeks the parties’ desires regarding the resolution of the remaining counts of the complaint.

Apparently originally dated August 25, 1964, and recorded with Suffolk Deeds, Book 7920, Page 404.

Actually, this was the third amendment, the second having occurred on January 8, 1982.

This latter exception regarding Stop & Shop related to certain protections from competition for a general merchandise store and did not become a factor in this case.

Actually, this was the second amendment, the first having occurred on February 1, 1968.